UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JAMES L. RADERS,                                     CASE NO. 6:18-cv-00711-PGB-EJK

      Plaintiff,

vs.

MICHAEL FRANTZ, FRANTZ
COMMUNITY INVESTORS, LLC, and
FRANTZ VENTURES, LLC,

      Defendants.

_____/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff, James Raders, by and through undersigned counsel, and hereby files this Motion for Summary Judgment, and in support thereof states as follows:

## I.    Factual Background

This matter involves the theft and fraudulent acts of Defendant Michael D. Frantz (acting in his individual capacity and as the manager and owner of several real estate development companies including Defendants Frantz Ventures LLC ("Frantz Ventures") and Frantz Community Investors LLC ("FCI"), collectively "Frantz") to con funds from one of his childhood best friends, James Raders ("Raders), who Frantz testified he loved like a brother. (Exhibit A at 20:19-25 – 21:1-6).

In 2016, Raders and Frantz discussed opportunities for investments, including a property in Melbourne, Florida – called The Mansion. (Id. at 21:23-25 – 22:1-9). In light of these discussions, Frantz caused his accountants with RSM US (formerly McGladrey), a national accounting firm which represented Frantz, to participate in calls with Raders to inform that if Raders' qualified retirement funds were paid over to Frantz, Frantz would use such funds for Frantz' tax credit real estate projects in a manner so that Raders' foreseeable tax liabilities would be offset and Raders' would not have to withhold tax from the retirement account liquidation. (Exhibit B at ¶ 9).

In oral discussions, Frantz represented to Raders that (1) Raders would have no tax liabilities resulting from Raders' full liquidation of Raders' retirement account and insurance proceeds and delivery thereof (thereby telling Raders not to withhold from giving Frantz tax liability amounts of about $1 million); (2) Frantz would invest Raders' funds in tax credit investments that would shelter any tax liability resulting from Raders' retirement account and life insurance policy liquidation; (3) Frantz would involve Raders in real estate ventures to be approved by Raders and in which Raders would be able to both invest and actively participate; and (4) Frantz would have RSM represent Raders and structure the use of Raders' funds only in historic tax credit properties that would yield tax

credits that would offset the tax liability associated with the early withdrawal of Raders' retirement funds. (Id. at ¶ 10).

On March 7, 2016, Frantz caused RSM to deliver to Raders a "promissory note" evidencing that Raders had funded to Frantz the amount of $3,000,000 which included prior amounts funded and the new amounts being funded from Raders' retirement accounts and life insurance policy. (Exhibit C). The promissory note indicated an interest rate in the minimum amount of 10%, but Frantz had verbally told Raders that the minimum amount would be 12%. (Id.). Frantz did not sign the form promissory note, but Raders signed it and returned it to Frantz and his accountants, misunderstanding the error in signature. (Doc. # 10-2 and Exhibit B at ¶ 13).

Also during the course of these discussions, Frantz verbally and repeatedly told Raders that his "net worth" was over $27 million and delivered to Raders a Personal Financial Statement, dated July 15, 2016 (Exhibit B at ¶¶ 14, 17), to confirm those representations. The Financial Statement was either prepared by Frantz and reviewed by RSM, or prepared by RSM and reviewed by Frantz. (Exhibit A at 29:5-12). Nonetheless, Frantz signed the Financial Statement, on behalf of himself, as well as signed on behalf of his then-wife, Susan Frantz. (Id. at 29-13-20; 30:1-10). In signing the Financial Statement, Frantz attested to the following: "I/We, the undersigned, do hereby certify that the within financial

report is a true and correct statement of my/our financial condition . . . ." (Id. at 29:21-25; see also Doc. # 10-3). According to the Financial Statement, Frantz – along with Susan Frantz – represented their net worth was $27,770,655. (Doc. # 10-3).

But, in fact, Frantz was substantially in debt at the time he sought Raders' funds and had numerous legal judgments and pending lawsuits (including claims for fraud) existing when Frantz solicited Raders' funds. (Doc. # 10-6). Frantz failed to inform Raders of these debts and liabilities and lied on the Financial Statement Frantz delivered to Raders by overstating his worth and by not identifying any of these lawsuits and judgments or other liabilities in representing his financial net worth to Raders. (Exhibit B at ¶¶ 18-19).

Specifically, during his deposition, Frantz was asked about litigation styled Paul Anthony Baxter v. Michael D. Frantz and Susan Frantz, filed in the Circuit Court of Cook County, Illinois. (Exhibit A at 33:6-23). Frantz testified that he was aware of this litigation and that the judgment had not been paid off. (Id.). The Final Judgment against Frantz was for $257,536.40 and was entered on February 10, 2016. (Doc. # 10-6). However, there is no mention of this judgment – a liability – on the Financial Statement. (Doc. # 10-3). Neither were liabilities to others, including Hammon, who had a note from and a judgment against Frantz for over $3 million. (Doc. # 10-6).

Based on the promises from Frantz, as well as his representation of substantial net worth, Raders liquidated his retirement accounts and paid over to Frantz the amount of $2,482,453.04 by wire transfer on March 8, 2016 and liquidated his life insurance equity in the amount of $19,759.92 and paid such sums to Frantz by wire transfer on March 17, 2016 to the Frantz Ventures bank account. (Doc. # 10-1; Exhibit D at 69).

Attached hereto, as Exhibit D, is a copy of the Frantz Ventures bank statement produced by Frantz in this case (the "FV Bank Statement"). The FV Bank Statement shows that, prior to Raders' funds being delivered to the Frantz Ventures account at the end of February, 2016, the account was overdrawn by over $21,893. (Id. at 69).  Then, in less than 48 hours after the receipt of Raders' funds in the amount of $2,482,453.04 received by wire transfer to the Frantz Ventures account on March 8, 2016, Frantz disbursed nearly all of Raders' funds for purposes *other than* what he had promised to Raders. (Id. at 69-72). Frantz' disbursements included using Raders' funds to pay other persons from whom Frantz had borrowed money, lawyer and accounting fees and personal debts such as his and his family's personal auto loans, medical bills and student loan bills. (Id.) In the month of March, 2016, Frantz had used almost all of Raders' money and the balance remaining at the end of month was just $273,101.57. (Id. at 72).

Frantz testified in his deposition that Frantz Ventures was a "shell company" and that account was used as a holding account. (Exhibit A at 16:17-25 – 17:1-3). When questioned about the specific expenses paid from the Frantz Ventures' bank account(s),[1] Frantz testified that many of the disbursements from the Frantz Ventures account were used to pay personal expenses. (Exhibit E at 24:25 – 25:1-6). Frantz' then wife, Susan Frantz, testified that she wrote checks on the Frantz Ventures bank account for personal expenses, including for residential garbage service, residential cleaning services, therapy, her daughter's car payments, personal residences utility bills, a new residential home furnace, dental expenses, therapy and student loans, among other things. (Exhibit F at 26:1-7; 37:14-20; 57:4-62:15).

Frantz Ventures is a shell company used by the Frantz family for their personal expenses and did not operate with any organizational or operational documentation.[2] (Id. at 40:3-23). As the manager of Frantz Ventures, Frantz testified that he used the Frantz Ventures accounts for his personal expenses

---

[1]   The evidence shows that there were two Frantz Ventures accounts, one at Iowa City Credit Union and one at Cedar Rapids Bank and Trust. (Exhibit E at 22:6-13).

[2]   Exhibit G contains Frantz' deposition testimony given to the U.S Attorney for the Department of Justice, acting as counsel to the Bankruptcy Trustee in Bankruptcy Case Number 19-23077, in which Frantz testified that there were never any organizational documents for Frantz Ventures, no entity minutes, no annual reports or organizational formalities. (40:3-23).

because "I owned it and I - - we had a record of all personal and business expenses and so we never worried about it." (Exhibit E at 25:4-7) .[3]

Frantz was in financial trouble and needed immediate funds to pay off other debts (both personal and professional), and Frantz stole Raders' money to do so by promising him investments with great returns. Then, Frantz used Raders' funds to pay other prior "investors" and other debts.[4] (Exhibit D at 69-72). Then, as Frantz now admits, Frantz failed to pay Raders back and failed to perform under the Investment Agreement, as discussed below. (Exhibit A at 39:16-42:18).

When Raders became aware that the "promissory note" delivered by Frantz was not valid, Raders enlisted an attorney to communicate with Frantz, as well as Frantz' accountant, Dean Price – an employee at McGladrey/RSM, and to draft a confirming agreement setting forth the agreements and confirming the amounts that Frantz owed to Raders, as of the date Raders delivered his money to Frantz. (Exhibit H). After conducting a telephone conference with Frantz and the accountant, Dean Price, on September 8, 2016, Raders then-counsel prepared a draft Investment Agreement memorializing what had transpired and the

---

[3]   While Frantz claims there was a reconciliation between professional and personal expenses, and that he got it approved by RSM, no such documentation has ever been produced in this litigation. Moreover, Susan Frantz – who also had signature authority on the account – testified that she has never seen such documentation.  (Exhibit F at 68:7-10).

[4]   One such disbursement was a payment of $100,000 to Kristin LaFave, who was Frantz' girlfriend at the time, according to the then Mrs. Frantz. (Exhibit F at 64:17-25-65:1-7), although Frantz indicated in his deposition that Ms. LaFave was a friend and potential investor (Exhibit A at 55:3-15).

agreements made regarding Raders' funds and sent it to both Frantz and his accountant. (Id.; Exhibit E 47:12-25-48:1-9).

Frantz executed the Investment Agreement on September 16, 2016 on behalf of FCI and himself, individually, and Raders countersigned it. (Doc. # 10-4; Exhibit E at 47:4-11). The Investment Agreement had an effective date of March 7, 2016. (Doc. # 10-4).

The Investment Agreement confirmed that the base investment principal amount that Raders had paid over to Frantz totaled $3,103,306.80.  (Id.). Under the Investment Agreement, Frantz and FCI were obligated, among other things, to do the following:

> **Section 1.     Acknowledgement of Receipt of Base Investment Funds;
> Agreements for Retirement Account Funds Investment; Remedies**
> . . .
>   (c)    The Retirement Account Funds shall be invested in qualified projects that qualify for issuance of historic tax or other tax credits and that such tax credits shall be allocated to Raders to fully offset any tax due as a result of Raders liquidating the Retirement Account Funds, thereby creating a taxable event with an estimated tax due on or before April 15, 2017, in the approximate amount of $970,000 (the "Liquidation Tax Liability").
>
>   (d) In the event that FCI and Mike Frantz have not fully complied with the obligations under this Agreement to fully document the transactions contemplated hereunder to the reasonable satisfaction of Raders on or before October 31, 2016, then Raders shall have the right to require a refund to him of all of the Base Investment amount, together with (i) the amounts equal to ten percent (10%) on such Base Investment amount funds from the date such amounts were funded to FCI (provided that the payments received shall be credited to such interest amount as shown on Exhibit A) and (ii) liquidated damages in the amount of the Liquidation Tax Liability payable by Raders for 2016. Raders shall have the right (but not

obligation) as an additional remedy hereunder to characterize the Base Investment amount as a loan to FCI and Mike Frantz with an effective interest rate of 45%, which loan and all interest thereon shall be due and payable in full on or before December 31, 2016.

**Section 2.**   <u>**Documentation**</u>   FCI shall provide to Raders all documentation relating to the investment of Raders' Base Investment, including identification of all Owned Properties and Operating Agreements for the entities that are the legal asset owner entities of such Owned Properties and evidencing the exact percentage interest therein of Raders' invested funds . . . .

(<u>Id</u>.).

During his deposition, when Frantz, individually, was asked whether he invested Raders funds "in qualified projects that qualified for issuance as historic tax or other tax credit," and he testified "it was not done," and blamed the failure to comply on the "collapse of Hotel Northland." (Exhibit A 39:9-18; 42: 9-18; 49:1-5). Frantz, on behalf of FCI, testified that he was aware of the obligations set forth in the Investment Agreement and that FCI did not meet the obligations under the Investment Agreement. (Exhibit E at 50:11-16).

From and after the execution of the Investment Agreement, Frantz continually failed to honor the provisions and, as a result, Raders caused a default and demand notice to be sent to Frantz. (Doc. # 10-5).

In November, 2016, Frantz advised Raders of the "investments you[r] money was used for, mostly pre-development and/or pre construction costs."[5]

---

[5]   <u>See</u> Exhibit G at 32:7-17 wherein Frantz advises that as of 2016, all entities other than Hawk Capital were shut down and not operating suggesting that as of 2016 Frantz and his companies were out of funds and not operating.

(Exhibit H). However, no such investment was actually made and, as to one of the investments he referenced – Hotel Northland – Raders previously advised Frantz that "I would never take my entire net worth and put it in something like the Northland when I really have no equity position and my return was undefined. That would be a bit too risky for me." (Id.).  Moreover, the November 2016 e-mail from Frantz is completely devoid of any of the documentation required under the Investment Agreement. To date, Frantz has failed to provide Raders with any documentation relating to the utilization of Raders' funds, whether for the Hotel Northland or any other project.

Furthermore, Frantz provided inaccurate testimony about his Bankruptcy litigation, and the conclusion of same. When asked about the resolution of the Bankruptcy matter, Frantz testified that "Well . . . [the bankruptcy trustee] did, you know, perhaps hundreds of thousands of dollars of forensic accounting and didn't find anything" . . . "that would suggest that anybody who had made claims would – you know, should or could be paid back or any malfeasance." (Exhibit A at 64:25-65:1-15).  Frantz testified that he "withdrew" the Bankruptcy to deal with creditors himself. (Id. at 68:13-22). The fact is, however, that Frantz faced several adversarial claims filed by creditors asserting non-dischargeability based on, among other things, fraud. With these assertions pending, the U.S. Bankruptcy Trustee asserted non-dischargeability on behalf of the Trustee and all creditors,

thereby making moot the similar claims of the individual creditors.[6] The Trustee prosecuted the adversarial case against Frantz and deposed Frantz. (Exhibit G and I). A Final Judgment was issued as to non-dischargeability in the adversary proceeding. (Exhibit J). The Order was based on Frantz stipulating to non-dischargeability of any claims under Section 727(a)(5) of the US Bankruptcy Code. (Id.)[7] This was not a dismissal by Frantz as he suggests, but a ruling that, due to Frantz' actions, all of Frantz' debts listed in the bankruptcy, including Raders' claim, are non-dischargeable.

The undisputed factual evidence outlined herein shows that Raders is entitled to summary judgment as a matter of law on all claims and counts set forth in Raders' Complaint.

## II.   Legal Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To defeat a

---

[6]   See Case No. 19-2114, filed in the United States Bankruptcy Court, Eastern District of Wisconsin.

[7]   This Section denies discharge due to "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities"

motion for summary judgment, the nonmoving party must "go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006).

## III.   Analysis

### a.   Count 1 - Fraud in the Inducement

It is well-settled in Florida that fraud in the inducement requires proof of: (1) a false statement of a material fact; (2) that the defendant knew or should have known was false; (3) that was made to induce the plaintiff to enter into a contract; and (4) that proximately caused injury to the plaintiff when acting in reliance on the misrepresentation. Bradley Factor, Inc. v. United States, 86 F. Supp. 2d 1140, 1146 (M.D. Fla. 2000). The requirement of a false statement includes material misrepresentations *or omissions of fact.* Id.; see Butterworth v. Quick & Reilly, Inc., 998 F. Supp. 1404 (M.D.Fla.1998); Barnes v. Burger King Corp., 932 F. Supp. 1420, 1425 (S.D. Fla. 1996).

In this case, Frantz misrepresented his financial net worth to Raders to induce Raders to believe that Frantz was a financially successful real estate developer who would bring Raders' into Frantz' beneficial real estate development projects and put Raders' funds into historic tax credit investments. Frantz represented to Raders that Frantz had a net worth of over $27 million. (Exhibit B at ¶¶ 9, 14, 17). Frantz confirmed this representation in a Financial

Statement in which Frantz certified to the truth of the matters therein and confirmed his net worth to be $27,770,655. (Doc. # 10-3). Frantz also testified in his deposition that he signed his then-wife Susan's name to the financial statement but failed to tell Raders that Susan did not sign it herself. (Exhibit A at 29-13-20; 30:1-10; Exhibit B at ¶¶ 15-16).

The Financial Statement was false and did not reflect the numerous judgments and liabilities pending against Frantz, including those listed on the bankruptcy schedule of creditors filed in Case No. 19-23077, in the U.S. Bankruptcy Court, Eastern District of Wisconsin. (Exhibit K; Exhibit B at ¶¶ 18-19). Frantz omitted material information which would impact any reasonable investor's decision whether to provide investment or loan funds to Frantz. (Exhibit B at ¶ 20).

Frantz used his deep personal friendship with Raders to lure him in and deceived Raders into believing that Frantz would let Raders into the family business and make him a lot of money, promising Raders a return of over 10 percent. (Exhibit B at ¶ 36; Doc. # 10-2). Raders trusted his best and oldest friend and Frantz took advantage of that trust to deceive Raders into believing that Frantz would invest Raders' money into legitimate real estate investments that involved tax credits. (Id.).

Frantz also promised Raders that Frantz would have his accounting firm, McGladrey (now RSM US), a leading accounting firm in the U.S., structure the transactions that would assure that the tax credits arising out of Frantz' real estate deals would benefit Raders from a tax offset perspective, thereby sheltering the taxes that would be due as a result of the liquidation of Raders' retirement accounts to fund Raders' proceeds to the Frantz Ventures account. (Exhibit B at ¶ 10). These understandings were commitments by Frantz, which were then documented in the Investment Agreement. (Doc. # 10-4). But the fact of Frantz' deep financial troubles and the lack of disclosure of those financial issues to Raders, resulted in deceiving Raders into providing Raders' funds to Frantz.

During his deposition in the U.S. Trustee adversary case, Frantz testified that he only had prepared two financial statements between 2016 and 2019 and that there were no others. (Exhibit G at 57-58). However, Frantz did issue another Financial Statement to Raders dated July 15, 2016, to confirm what Frantz had already told Raders: that Frantz was financially stable and worth over $27 million. (Doc. # 10-3). But this information was false, and Frantz admitted that he was then in financial trouble relating to one project known as Hotel Northland. (Exhibit G at 32:7-17). The Frantz Ventures bank account had a negative balance of over $21,000 when Frantz was seeking Raders' funds in February of 2016.

Unknown to Raders, this was not the first time Frantz had stolen funds from a friend when Frantz was in need of funds; Frantz did the same to Greg Hammon and his own girlfriend, Kristin LaFave. (Doc. # 10-6). Had Raders known of these material facts regarding Frantz' financial and legal troubles, Raders would not have entered into any transactions with Frantz and would not have delivered his funds to Frantz. (Exhibit B at ¶ 37).

Under Florida law, these facts make for a clear and convincing case of fraud in the inducement against Frantz. Each element of the fraud test is met here by the evidence showing that: (1) Frantz made false statements about his net worth and real estate projects having historic tax credits, both of which were material facts for Raders' decision to fund money to Frantz for future investment purposes (and would be so for any reasonable investor); (2) Frantz knew or should have known that the information he was giving Raders was false regarding Frantz' financial net worth and Frantz knew or should have known that omitting information regarding the numerous judgments and lawsuits by creditors was material and that omitting such information on Frantz' proffered Financial Statement was material; (3) Frantz actively and aggressively sought Raders' funds and delivered such false information to (and withheld other critical information from) Raders to induce Raders to fund his money to Frantz; and (4) Frantz' fraudulent actions were the proximate cause of Raders funding his money to Frantz since Raders believed

and relied on Frantz and, thereby, Raders lost his funds by acting in reliance on Frantz' misrepresentations. See Bradley (supra).

### b. Count 2 - Breach of Contract

Under Florida law, to state a cause of action for breach of contract, the plaintiff must allege: "(1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach." Altamonte Pediatric Assocs., P.A. v. Greenway Health, LLC, No. 8:20-CV-604-T-33JSS, 2020 WL 5350303, at *7 (M.D. Fla. Sept. 4, 2020). A valid contract is generally composed of four basic elements: offer, acceptance, consideration, and sufficient specification of essential terms. Rauch, Weaver, Norfleet, Kurtz & Co. v. AJP Pine Island Warehouses, Inc., 313 So. 3d 625, 630 (Fla. 4th DCA 2021).

Here, the Investment Agreement confirmed that the base investment principal amount that Raders had paid over to Frantz totaled $3,103,306.80, to which Frantz, on behalf of himself individually and FCI, accepted. (Doc. # 10-4). In executing the Investment Agreement, which memorialized the agreements between Frantz and Raders (Exhibit E 47:12-25-48:1-9), the parties agreed that:

> NOW, THEREFORE, in consideration of the foregoing of mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiently of which hereby are acknowledged, the parties hereby agree as follows . . . .

(Doc. # 10-4). Finally, the Investment Agreement provides specification as to the obligations of all parties under the Agreement, of which Frantz testified that he

was aware. (Id.). Moreover, the Defendants have not raised any affirmative defense relating to whether a valid agreement existed.

Frantz executed the Investment Agreement on behalf of FCI and himself, individually. (Doc. # 10-4; Exhibit E at 47:4-11). Under the Investment Agreement, Frantz and FCI were obligated, among other things, to comply with Section 1(c), (d) and Section 2, requiring that Raders' funds be invested in qualified projects and that proper documentation be provided to Raders. (Id.). During his individual deposition, as well as on behalf of FCI, Frantz testified that the material obligations set forth in the Investment Agreement were not complied with. (Exhibit A 39:9-18; 42: 9-18; 49:1-5; Exhibit E at 50:11-16).

Frantz continually failed to honor the provisions thereof including failing to account for Raders' funds, failing to invest Raders' funds in qualified investments and failing to pay Raders interest on the funds and, as a result, Raders caused a default and demand notice to be sent to Frantz. (Doc. # 10-5). Based on the testimony of Frantz himself, Frantz signed the Investment Agreement and did not perform thereunder. Such default resulted in damages to Raders, including the loss of all of Raders' funds.

### c. <u>Count 3 – Civil Theft</u>

In order to establish an action for civil theft, the claimant must prove the statutory elements of theft, as well as criminal intent. <u>Fla. Desk, Inc. v. Mitchell</u>

Int'l, Inc., 817 So. 2d 1059, 1060–61 (Fla. 5th DCA 2002). Pursuant to Fla. Stat. §

812.04,

> (1)   A person commits theft if he or she knowingly obtains or uses, or
> endeavors to obtain or to use, the property of another with intent to, either
> temporarily or permanently:
> (a)   Deprive the other person of a right to the property or a benefit from
> the property.
> (b)   Appropriate the property to his or her own use or to the use of any
> person not entitled to the use of the property.

In order to establish an action for civil theft, the claimant must prove that a

conversion has taken place and that the accused party acted with criminal intent.

Transcapital Bank v. Shadowbrook at Vero, LLC, 226 So. 3d 856, 864 (Fla. 4th DCA

2017). Such intent must be proven by clear and convincing evidence.

Westinghouse Elec. Corp. v. Shuler Bros., Inc., 590 So. 2d 986, 988 (Fla. 4th DCA

1991). The Florida Supreme Court has interpreted section 812.04 to require only

the "intent to deprive," rather than the "intent to permanently deprive." State v.

Dunmann, 427 So. 2d 166 (Fla. 1983).

To be the "proper subject" of a civil theft claim, money must be "capable of

identification." Belford Trucking, Co. v. Zagar, 243 So. 2d 646, 648 (Fla. 4th DCA

1971). "Money is capable of identification where it is delivered at one time, by one

act and in one mass, or where the deposit is special and the identical money is to

be kept for the party making the deposit, or where wrongful possession of such

property is obtained." Id.

Summary judgment has been granted in cases similar to this case.  In <u>Burke v. Napieracz</u>, 674 So. 2d 756 (Fla. 1st DCA 1996), the court held that the economic loss rule did not preclude a cause of action for a tort distinguishable from, or independent of, breach of contract where the defendant was to receive specifically identifiable social security funds, deposit those funds in an identifiable bank account, and forward the funds to plaintiff. There, the defendant was not authorized to withdraw monies from the account except as specifically authorized by Burke. The First District noted that breach of the agreement would have resulted from the defendant's failure either to properly deposit the social security funds or to provide the funds to Burke as requested. A tort was committed because, not only did the defendant fail to perform his contractual obligations, he took the funds for his personal use. The court held that an "affirmative and intentional act of converting the funds to his own use by allegedly stealing the monies to which he was entrusted" gave rise to a tort separate and independent from the breach of contract. <u>Id.</u> at 758; (<u>see also</u> <u>Alex Hofrichter, P.A. v. Zuckerman & Venditti, P.A.</u>, 710 So. 2d 127 (Fla. 3d DCA)(where defendant, by intentional misconduct, converted plaintiff's property to his own use, this was more than a claim for a simple breach of contract and actions for conversion and civil theft were not barred by economic loss rule), <u>review denied</u>, 728 So. 2d 206 (Fla.1998).

Frantz knowingly and brazenly transferred Raders' funds out of Frantz Ventures' bank account for other reasons, including (as Frantz testified) for payment on his accounting bill to RSM US, to pay a debt to Kristin LaFave, to pay his daughter's school loans, among other transfers as shown on the FV Bank Statement. (Exhibit D at 69-72). Within 48 hours, the vast majority of Raders' funds were transferred out of the Frantz Ventures account, into which they had been wired, for completely unauthorized purposes. (Id.). By Frantz' own admission in deposition testimony, he used the Frantz Ventures funds as his own, for personal uses. Id. In doing so, Frantz fully intended (and did) appropriate Raders' funds for Frantz' own use and benefit, thereby depriving Raders of the agreed use thereof.

### d. Count 4 - Conversion

Under Florida law, conversion is an "unauthorized act which deprives another of his property permanently or for an indefinite period of time." Fogade v. ENB Revocable Trust, 263 F.3d 1274, 1291 (11th Cir.2001). Thus, in order to state a claim of conversion, one must allege facts sufficient to show ownership of the subject property and facts that the other party wrongfully asserted dominion over that property. Indus. Park Dev. Corp. v. Am. Exp. Bank, FSB, 960 F. Supp. 2d 1363, 1366 (M.D. Fla. 2013); Edwards v. Landsman, 51 So. 3d 1208, 1213 (Fla. 4th DCA 2011).

In <u>C.S.I.R. Enterprises, Inc. v. Sebrite Agency, Inc.</u>, 214 F. Supp. 2d 1276, 1290 (M.D. Fla. 2002), the Court, found that the plaintiff had reached an oral agreement with the defendants and paid $200,000.00 to the defendants who then failed to secure an insurance policy as agreed upon and failed to return the funds to the plaintiff. In applying the reasoning used by the <u>Burke</u> court, the <u>C.S.I.R.</u> court determined that the defendant did more than fail to perform the agreement with plaintiff; the defendant had converted plaintiff's funds for their own use, which is independent from any breach of the oral agreement. <u>Id.</u> The C.S.I.R. court then found that there was evidence before it that the defendants committed an "affirmative and intentional act" in converting the plaintiff's money for their own use. <u>Id.</u> In this case, the facts supported by the record evidence are similar and show that Frantz converted Raders' funds to Frantz' own use for unauthorized purposes. Frantz admitted in deposition testimony that the funds in the Frantz Ventures' bank account belonged to Raders. (Exhibit A at 24:9-25).

Frantz acknowledged and agreed in the Investment Agreement that Frantz had received Raders' funds in the amounts as set forth in the Investment Agreement.  Frantz also admitted that he used Raders' funds for the purposes outlined in the deposition testimony for personal and business uses not related to an investment of Raders' funds in approved real estate projects. In fact, Raders has never received any interest in any real estate projects that Frantz was developing

(other than the South Cedar Properties, which was prior to the 2016 funding). (Exhibit B at ¶¶ 32-34). Raders never received any K1s or documentation that Raders owned any interest and was entitled to any profit or loss in any real estate project that Frantz was involved in. (Id.). Raders never received anything related to any real estate investment and has failed to receive any return of his funds. (Id.).

### e. **Count 5 – Unjust Enrichment**

To state a claim for unjust enrichment, a plaintiff must plead the following elements: 1) the plaintiff has conferred a benefit on the defendant; 2) the defendant has knowledge of the benefit; 3) the defendant has accepted or retained the benefit conferred; and 4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it. Della Ratta v. Della Ratta, 927 So. 2d 1055, 1059 (Fla. 4th DCA 2006). In this case, the facts support a finding of summary judgment since Frantz admitted in deposition testimony that (1) Frantz received Raders' funds and used such funds for payment to Frantz' other creditors, (2) Frantz knew that he was using Raders' funds for his own benefit, (3) Frantz retained the benefit of the payments to third parties that he paid with Raders' funds, and (4) the circumstances are such that it would be inequitable for Frantz to retain the benefit of Raders' funds without paying Raders for the use of those funds.

**f.** <u>**Count 6 – Piercing of Corporate Veil of Frantz Ventures, LLC**</u>

Generally, the corporate veil will not be pierced absent a showing of improper conduct. <u>Dania Jai–Alai Palace, Inc. v. Sykes</u>, 450 So. 2d 1114, 1121 (Fla.1984). Under this standard, it must be shown that the corporation was organized or used to mislead creditors or to perpetrate a fraud upon them.  <u>Seminole Boatyard, Inc. v. Christoph</u>, 715 So. 2d 987, 990 (Fla. 4th DCA 1998).  Three factors must be proven by a preponderance of the evidence:

> (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation;
> (2) the corporate form must have been used fraudulently or for an improper purpose; and
> (3) the fraudulent or improper use of the corporate form caused injury to the claimant.

<u>Id</u>.  In this case, Frantz Ventures was a shell of an entity without any corporate formation documents and without following any corporate formalities. (Exhibit A at 16:17-25 – 17:1-3; Exhibit G at 40-3-23). Frantz and his then-wife, Susan Frantz, both testified that they used the Frantz Ventures account for personal expenses not related to any interest in real estate investments. (Exhibit E at 24:25 – 25:1-6; Exhibit F at 26:1-7; 37:14-20; 57:4-62:15). Quite simply, Frantz Ventures was used as a personal checking account for the Frantz family and not for any other reason and the members, Mike Frantz and Susan Frantz, were the alter egos of Frantz Ventures.

Frantz told Raders him Frantz Ventures was the corporate holding company that would then be used to make investments into approved real estate projects. (Exhibit B at ¶ 23). This corporate entity appeared to give legitimacy to Frantz' promise that Raders' funds would only be used for real estate investments. After all, the funds were going into a Frantz company, not to Frantz individually. Or so Raders thought. Raders certainly would not have given his money to Susan Frantz or Mike Frantz, individually. But by using Frantz Ventures as the alleged corporate holding company, Raders was led to believe that this company would hold Raders' funds separately from Frantz' funds. (Exhibit B at ¶ 23).

But that did not happen. Rather, once Raders deposited the money into the Frantz Ventures' bank account, Frantz then immediately used those funds as he had in the past, for payment of personal expenses, including car payments, tuition payments, cash and other personal expenses. As such, Frantz Ventures was used for illegitimate ends to hide financial activity including fraud and theft of funds, and Raders was harmed as a result. The facts in this case thus support a finding that the corporate veil of Frantz Ventures should be pierced and any assets thereof, if any, be held for the benefit of persons wronged by such corporate abuse.

### g.  **Defendants' Affirmative Defenses Fail As a Matter of Law**

In their Answer to the Amended Complaint, Defendants raised three (3) affirmative defenses. (Doc. # 27). Failure to state a claim is not a

recognized affirmative defense. <u>Spiegel & Utrera, P.A. v. Stevens & Lee, P.C.</u>, No. 10-23451-CIV, 2011 WL 13223501, at *1 (S.D. Fla. Apr. 21, 2011). Rather, such a defense relates to the precise issue being litigated here: whether Defendants are liable. <u>Lopez v. Leg.A.Sea Distr. Servs.</u>, *LLC,* No. 10-21847, 2010 WL 3767171, at *2 (S.D. Fla. Sept. 24, 2010)(noting "failure to state a claim" is improper basis for affirmative defense). Accordingly, Defendants' First and Second Affirmative Defenses fail, as a matter of law.

As it relates to Defendants' Third Affirmative Defense, neither the answer nor the affirmative defense details the purported failure to comply with the condition precedent. In fact, it remains unclear as to what condition was to have been satisfied prior to bringing in this lawsuit. <u>See</u> Fed. R. Civ. P. 8 (b)-(c). Therefore, Defendants' Third Affirmative Defense fails, as a matter of law.

Dated: September 3, 2021

Respectfully submitted,

<u>/s/ Krista N. Cammack</u>
Krista N. Cammack, Esquire (104718)
kcammack@wickersmith.com
Peter Bartoszek (1015519)
pbartoszek@wickersmith.com
WICKER SMITH O'HARA McCOY &
FORD, P.A.
*Attorneys for James L. Raders*
390 N. Orange Ave., Suite 1000
Orlando, FL 32801
Phone: (407) 843-3939
Fax: (407) 649-8118

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 3, 2021, I electronically filed the foregoing with the Clerk of the Courts by using the ECF system, which will send a notice of electronic filing to all counsel of record.

<u>/s/ Krista N. Cammack</u>
Krista N. Cammack, Esquire