# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                    ORLANDO DIVISION

 3  JAMES L. RADERS,              )
                                  )
 4              Plaintiff,        )
                                  )
 5       vs.                      ) No. 18 CV 711-ORL-40TBS
                                  )
 6  MICHAEL D. FRANTZ, FRANTZ     )
    COMMUNITY INVESTORS, LLC,     )
 7  and FRANTZ VENTURES, LLC,     )
                                  )
 8              Defendants.       )

 9          The remote videoconference deposition

10  of JAMES LORES RADERS, called by the Defendants

11  for examination, pursuant to notice and pursuant

12  to the Federal Rules of Civil Procedure for the

13  United States District Courts pertaining to the

14  taking of depositions, taken before Susan M.

15  Reed, Certified Shorthand Reporter for the State

16  of Illinois, at 2300 Front Street, Unit 400,

17  Melbourne, Florida, at 12:00 P.M., EST, on the

18  18th day of August, A.D., 2021.

19

20

21

22

23

24
```

JAMES LORES RADERS, 08/18/2021                                  Page 2..5

Page 2

```
 1   A P P E A R A N C E S :
 2
     WICKER SMITH O'HARA McCOY & FORD, PA
 3   MS. KRISTA N. CAMMACK
     390 North Orange Avenue, Suite 1000
 4   Orlando, Florida 32801
     407.843.3939
 5   kcammack@wickersmith.com
         appeared via videoconference on behalf
 6       of the Plaintiff;
 7
 8   JOHNSON & BELL, LTD.
     MR. BRIAN C. LANGS
 9   33 West Monroe Street, Suite 2700
     Chicago, Illinois 60603
10   312.372.0770
     langsb@jbltd.com
11       appeared via videoconference on behalf
         of the Defendants.
12
13
14        *    *    *    *    *    *    *
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2
     WITNESS:
 3
     JAMES LORES RADERS
 4
```
```
        Direct Examination by Mr. Langs        5
 5      Cross-Examination by Ms. Cammack       89
        Redirect Examination by Mr. Langs     101
 6      Recross-Examination by Ms. Cammack    110
```
```
 7
 8
 9   EXHIBITS:
10
```
```
     Raders Deposition Exhibit No. 1         55
11   Raders Deposition Exhibit No. 2         64
     Raders Deposition Exhibit No. 3         70
```
```
12
13
14
15        *    *    *    *    *    *    *
16
17
18
19
20
21
22
23
24
```

Page 4

1   (12:00 p.m.)
2       MS. REPORTER:  Before we proceed I will
3   ask counsel to agree on the record that there is
4   no objection to this deposition officer
5   administering a binding oath to the witness via
6   videoconference.  Please state your agreement on
7   the record.
8       MS. CAMMACK:  Krista Cammack on behalf
9   of the plaintiff.  I agree to proceeding in such
10  a manner.
11      MR. LANGS:  Brian Langs on behalf of
12  defendants.  Also agreed.
13      (Witness sworn.)
14  WHEREUPON:
15      JAMES LORES RADERS
16  called as a witness herein, having been first
17  remotely duly sworn, was examined upon oral
18  interrogatories and testified as follows:
19
20
21
22
23
24

Page 5

1       DIRECT EXAMINATION
2       by Mr. Langs:
3   Q.  I guess it's afternoon where you guys
4   are.  Good afternoon, Jim.  My name is Brian
5   Langs.  I'm an attorney that's representing Mike
6   Frantz, Frantz Community Investors, LLC, and
7   Frantz Ventures, LLC, in a lawsuit that you
8   filed against them.  Does that make sense to
9   you?
10  A.  Yes, sir.
11  Q.  Can you please state your name for the
12  record?
13  A.  James Lores Raders.
14      MR. LANGS:  Let the record reflect that
15  this is the discovery deposition of Jim Raders
16  taken pursuant to notice, agreement, Federal
17  Rules of Civil Procedure, and all applicable
18  local rules.
19  BY MR. LANGS:
20  Q.  Mr. Raders, can I call you Jim, or do
21  you prefer Mr. Raders?
22  A.  I'm happy with Jim.
23  Q.  Okay.  Have you ever given a deposition
24  before, Jim?

Page 6

1    A.  Yes, sir.
2    Q.  All right.  Actually a couple ground
3  rules, if you could wait for me to finish the
4  question.  I'll do the same.  I'll wait for you
5  to answer before I ask another question.  It
6  just makes it easier on the court reporter.
7  Along those lines, when I ask you a question,
8  please use a verbal yes or no rather than a
9  shake of your head or uh-uh because it makes it
10  easier for the court reporter again.  If you
11  don't understand a question, let me know and
12  I'll try to rephrase it so that you understand
13  it.  If you do answer a question, I'm going to
14  assume that you understood the question.  Is
15  that fair?
16    A.  Yes, sir.  Please state the last
17  sentence again.  I'm sorry.
18    Q.  I said, if you answer a question and
19  you don't ask me to rephrase it, I'm going to
20  assume that you understood the question.  Is
21  that fair?
22    A.  Yes, sir.
23    Q.  We're on your time today, so as long as
24  there's not a question pending, we can take a

Page 7

1  break whenever you want.  If there is a question
2  pending, I'll just ask that you answer that
3  question, and then we can take a break.  Is that
4  fair also?
5    A.  Yes.  I'm just going to wipe my screen
6  because there's a dot on your head and you don't
7  want to look like that.  All right.  Thank you.
8    Q.  Are you on any medication today that
9  affects your ability to answer my questions?
10    A.  No, sir.
11    Q.  I don't mean any disrespect, but we ask
12  this of everybody we depose.  Have you ever been
13  convicted of a felony?
14    A.  No, sir.
15    Q.  How about a crime of dishonesty?
16    A.  A crime of?
17    Q.  A crime of dishonesty.
18    A.  No, sir.
19    Q.  I think you said that you have been
20  deposed before; is that correct?
21    A.  Yes.
22    Q.  How many times have you been deposed?
23    A.  It would be hard to -- probably seven
24  or eight.

Page 8

1    Q.  Those seven or eight depositions, were
2  they depositions in respect to field being a
3  doctor, or were they other types of lawsuits?
4    A.  Yes, they were with respect to my
5  field.
6    Q.  Have you ever been deposed in any
7  lawsuit that was not related to medical
8  malpractice or personal injury?
9    A.  As a plaintiff or as a defendant or
10  either one?
11    Q.  Any deposition.
12    A.  Yes.
13    Q.  What kind of deposition was that?  What
14  kind of case was that?
15    A.  It's an active case against RSM and
16  Dean Price.
17    Q.  All right.  How about any other cases
18  that you have been deposed in that weren't
19  personal injury or medical malpractice?
20    A.  One medical malpractice case.
21    Q.  And I don't need to hear anything about
22  that one.  I'm just interested in other types of
23  cases that you might have been deposed in.
24    A.  Oh, the other cases were as treating

Page 9

1  physicians and expert witnesses for the U.S.
2  government in Medicare fraud.
3    Q.  Okay.  So the only other one is the
4  lawsuit that you filed against Dean Price and
5  RSM, correct?
6    A.  Correct.
7    Q.  What's your date of birth?
8    A.  November 12, 1954.
9    Q.  What did you review in preparation for
10  your deposition today?  Before you answer, I
11  don't want you to tell me anything you talked
12  with your attorney about.  But just if you could
13  let me know if you looked at any documents, I'd
14  like to know what documents those were?
15    A.  I have reviewed the emails between
16  myself and Mike Frantz.  If you don't mind, I'll
17  call him Mike.
18    Q.  That's fine.
19    A.  And the texts between Mike and myself
20  and the investment agreement signed in September
21  of 2016.
22    Q.  These emails between you Mike and these
23  text messages between you and Mike, where would
24  you find those?

JAMES LORES RADERS, 08/18/2021                                Page 10..13

Page 10

1    A.  Where did I find them?
2    Q.  Yeah, before you reviewed them, where
3    did you have them located?
4    A.  I have them electronically stored.
5    Q.  Are those electronically stored because
6    you put them there, or were those text messages
7    and emails produced by somebody else in this
8    case or another case?
9    A.  No, I put them there.
10   Q.  Do you know whether or not you produced
11   those emails and text messages in this case?
12   A.  I believe we have, yes.
13   Q.  What's your current address?
14   A.  2300 Front Street, #400, Melbourne,
15   Florida, 32901 for six more days -- seven more
16   days.  We're moving.
17   Q.  Where are you moving to?
18   A.  Just -- we're downsizing.  We're going
19   to another place in Melbourne, Florida.  Do you
20   need the address?
21   Q.  No, no.  Same area?
22   A.  Yes.
23   Q.  Who do you live with currently?
24   A.  My wife and children.

Page 11

1    Q.  Is your wife Taci; is that correct?
2    A.  Yes.  Very good.
3    Q.  How many kids do you have?
4    A.  Two step children.
5    Q.  How old are they?
6    A.  Oh, my goodness.  The daughter just
7    turned 16 on Monday, and the son is 18.
8    Q.  Almost done.
9    A.  Almost.
10   Q.  I have a 2-month-old.
11   A.  Oh, my goodness.  Congratulations.
12   Q.  How long have you been living at that
13   2300 Front Street address?
14   A.  It will be ten years in November.
15   We're not going to quite make ten years.
16   Q.  And where did you live before that?
17   A.  In Minneapolis, Minnesota.
18   Q.  How long were you in Minneapolis for?
19   A.  How long?  I'm sorry.  My audio is a
20   little quiet.  Maybe I'll want to change it.
21   Q.  I can get closer.
22   A.  I'll change it at a break, and I'll get
23   it into a different speaker system.  How long
24   did I live in Minneapolis, was that the

Page 12

1    question?
2    Q.  Correct.
3    A.  I lived in Minneapolis from 1985 to
4    2011.
5    Q.  When did you get married?
6    A.  January of 2017.
7    Q.  Is your wife employed?
8    A.  She is.
9    Q.  What does she do?
10   A.  She works for Employ Florida, which is
11   a company that administers programs for
12   re-employment incentives.
13   Q.  Does your wife know anything about the
14   allegations in this lawsuit?
15   A.  Yes.
16   Q.  Is there anything that she knows about
17   the allegations i this lawsuit that you do not
18   know?
19   A.  That I do not know?
20   Q.  Mm-hm.
21   A.  I wouldn't know that if I don't know
22   them.  She hasn't shared anything that I have
23   not previously known.
24   Q.  Does your wife talk to your lawyers or

Page 13

1    other people about this lawsuit when you're not
2    around?
3    A.  No.
4    Q.  How about your children, do they know
5    anything about the allegations of this
6    lawsuit -- or your step children I should say?
7    A.  No.  No.  Very superficial only.
8    Q.  Were you married to anyone else
9    previously?
10   A.  No.
11   Q.  Any other children with any other
12   people?
13   A.  No.
14   Q.  All right.  What kind of doctor are
15   you?
16   A.  I'm a female pelvic medicine and
17   reconstructive pelvic surgeon, otherwise known
18   as urogynecology.
19   Q.  When did you graduate from medical
20   school?
21   A.  1981.
22   Q.  Where did you go?
23   A.  University of Iowa.
24   Q.  What about undergrad?

Page 14

1    A.  University of Iowa.
2    Q.  Do you have any other technical
3  training, or do you belong to any professional
4  associations?
5    A.  Outside of my profession?
6    Q.  Well, anything else that you might do
7  on the side besides being a doctor?
8    A.  No, but there are many organizations I
9  belong to and sub organizations I belong to
10  being the kind of specialist I am.
11    Q.  Have you ever served in the military?
12    A.  No, sir.
13    Q.  Where are you currently employed?
14    A.  I work for a health care corporation
15  called Health First, and I am part of their
16  medical group.
17    Q.  As a practicing gynecologist?
18    A.  A urogynecologist, yes.
19    Q.  How long have you been working there?
20    A.  Forgive me.
21    Q.  Take your time.
22    A.  COVID closed our private practice in
23  March of 2020.  Is that correct when COVID came
24  the first time?

Page 15

1    Q.  That's about right, yeah.
2    A.  And I went to work for them in August
3  of that year.
4    Q.  Were you working between March 2020 and
5  August 2020?
6    A.  I was not.
7    Q.  And how long were you working at that
8  private practice that closed in March 2020?
9    A.  Since November of 2011.
10    Q.  What about before November 2011, where
11  were you working?
12    A.  In Minneapolis.  I had my own private
13  practice in Minneapolis.
14    Q.  How do you know Mike Frantz?
15    A.  I met Mike Frantz in the very beginning
16  of 7th grade, probably in the summer between 6th
17  and 7th grade, which would have been 1960 -- in
18  the 60's.  How is that?
19    Q.  That works.  And have you stayed
20  friendly with Mike Frantz up and until the
21  events of this lawsuit unfolded?
22    A.  Oh, yes.  We were very, very close.
23    Q.  Have you ever been in business with
24  Mike Frantz other than by investing money with

Page 16

1  him?
2    A.  No.
3    Q.  When was the first time you invested
4  money with Mike Frantz or one of his companies?
5    A.  South Cedar Properties was the first
6  investment that I did with Mike.  It was a group
7  of investors.  I don't think he put it together,
8  but I can't recall whether it was his primary --
9  how do I say that?  Whether he was the primary
10  of the company.  And that was in -- I can't
11  recall the exact year, but sometime around 2008
12  or 2009.  Something in there.
13    Q.  Do you consider the South Cedar
14  Properties investment successful?
15    A.  Yes, it was.
16    Q.  What kind of return on your investment
17  did you get?
18    A.  I can't recall the exact percentage.
19    Q.  Do you know how much money you invested
20  in South Cedar Properties?
21    A.  Somewhere -- I was trying to recall
22  that.  Somewhere around $40,000, give or take;
23  but I don't recall the exact number.  I can pull
24  those documents if you need them.

Page 17

1    Q.  No, that's all right.  I just wanted to
2  know what your recollection was.
3    A.  Everything's packed right now, so it
4  would take a while.
5    Q.  I won't hold you to it.  I should have
6  told you in the beginning as well, we really
7  don't want you to guess.  So I don't know or I
8  don't recall is a perfectly acceptable answer.
9  That being said, if you have a good estimate, I
10  won't hold you to it.  I would just like to hear
11  what your good estimate is.  Is that fair?
12    A.  Sure.  Yeah.
13    Q.  After you invested money with Frantz or
14  one of his companies through the South Cedar
15  Properties investment, when was the next time
16  you invested money with Mike or his companies?
17    A.  I can -- if you want me to refer to a
18  document, I can give you the dates.  It was in
19  2010 -- or 2010, and I gave Mike $50,000 on that
20  at that time.
21    Q.  In 2010 you gave Mike $50,000?
22    A.  Right.
23    Q.  Did you know what you were giving him
24  the money for?

Page 18

1    A.  He said it would be spread throughout
2  various parts of his companies, and he was going
3  to return 12 percent on that money.  I never got
4  specifics about that.  I trusted Mike
5  implicitly.
6    Q.  Did you consider that investment
7  successful?
8    A.  In foresight or hindsight?  In
9  hindsight, no.
10    Q.  Was there any return on that
11  investment?
12    A.  It was accruing.
13    Q.  Were you ever paid any dividends or
14  interest or anything like that on that 2010
15  investment?
16    A.  No, he was paying me interest on paper.
17    Q.  How much money was he paying you in
18  interest on paper?
19    A.  12 percent compounded.
20    Q.  Is that 12 percent on both the
21  investment with Cedar Properties and also this
22  2010 investment?
23    A.  No, that was separate.
24    Q.  How long did Mike or his companies

Page 19

1  continue paying you this 12 percent on the 2010
2  investment?
3    A.  Well, it never came to fruition because
4  the money was still there.  I never got the
5  money back out.
6    Q.  Okay.  How long did he continue making
7  these payments to you?  He was -- maybe I'm
8  misunderstanding what you testified to earlier.
9  I thought you had testified that you invested
10  $50,000, and he was paying you 12 percent on
11  that investment through periodic payments.  Was
12  he not making any payments on that investment?
13    A.  I said it was accruing.
14    Q.  Okay.  Gotcha.
15    A.  All of the investments I made with Mike
16  subsequently were accruing.  Payments were not
17  made.
18    Q.  When was the next time that you
19  invested any money with Mike or one of his
20  companies?
21    A.  In August of 2013.  After I sold my
22  home in Minneapolis, I gave him $250,000.
23    Q.  Did you understand what that $250,000
24  was going to be invested in?

Page 20

1    A.  At that time Mike and I talked a lot
2  about distributing that throughout various real
3  estate investments that he was involved in,
4  restoring properties and that sort of thing.
5    Q.  Did he get into any specifics and which
6  properties he was going to invest your money in,
7  or how did that work?
8    A.  Well, there were not specifics; but he
9  told me where some of the properties were
10  located; and at some point I received a brochure
11  from FCI, which I no longer have, about their
12  various holdings; but I can't remember what year
13  that was that I received that.
14    Q.  When you received that brochure from
15  FCI, did you know whether or not your $250,000
16  or any of your previous investments was actually
17  invested in any of those properties?
18    A.  I did not know for sure, but I was told
19  that -- by Mike that my investments were
20  distributed throughout the stark restoration
21  properties.  So I made the assumption -- I
22  trusted Mike implicitly with my money.
23    Q.  All right.  How about -- when was the
24  next time you invested any amount of money with

Page 21

1  Mike or his companies?
2    A.  Two months later I gave him another
3  $100,000 from house proceeds.
4    Q.  At that time did you discuss with Mike
5  specifically what that $100,000 was going to or
6  was there --
7    A.  No, sir.  It was very similar -- I'm
8  sorry to interrupt you.  Go ahead and finish.
9    Q.  No, go ahead.
10    A.  It was very similar to the previous
11  answer.  I will give you a general -- the
12  general discussion between Mike and I and what
13  prompted this was our high school reunion in
14  2013, that Mike was very interested in small
15  towns in the Midwest like the one we grew up in
16  or even smaller; and these downtowns were being
17  eviscerated by companies like Walmart and
18  Target; and Mike's mission, so to speak, was to
19  come into these towns and purchase buildings
20  that had available tax credits because the
21  downtown -- well, federal and state tax credits
22  because the downtowns wanted to revitalize.
23         And I was very interested in that,
24  and I will digress for one moment with my answer

Page 22

1  because part of my medical school training
2  involved doing an externship for three months in
3  a small town close to where I grew up in,
4  Manchester, Iowa; and I remember it when I was
5  younger as a beautiful little town; and when I
6  went back, unfortunately, the Walmart closed the
7  whole downtown; and everything was boarded up;
8  and it broke my heart.  So I was very interested
9  in that mission.
10      Q.  So just to recap here a little bit,
11  the first time you invested money with Mike, it
12  was about $40,000.  That was the South Cedar
13  investment in 2008 or 2009.  Another 50,000 in
14  2010, you never got specifics.  August 2013 you
15  gave him 250,000; and two months later, you gave
16  him 100,000.  Again, no real specifics, just
17  that the money was invested in -- throughout
18  these various real estate properties and
19  holdings; is that correct?
20      A.  Yes, sir.
21      Q.  During this time from 2008 through, you
22  know, 2013, were you ever given any return on
23  your investment?
24      A.  In terms of taking it out of the

Page 23

1  accrual?
2      Q.  In terms of taking it out of the
3  accrual, correct.
4      A.  No.
5      Q.  Were you ever given any paperwork or
6  documentation or did Mike ever tell you the
7  progress of your accrual?
8      A.  No, he just kept quoting to me that it
9  was making 12 percent.  I grew up with Mike and
10  his family, and I trusted him implicitly.
11      Q.  Did you ever ask Mike what those
12  numbers were?
13      A.  Once in a while we would discuss where
14  we were in terms of a summary, about how much 12
15  percent would be making, but that's it.
16      Q.  What was your long-term goal with these
17  investments?  Were these investments that you
18  were going to keep with Mike until retirement,
19  or what was the plan?
20      A.  I'm not sure that I actually had one.
21  Mike was holding money.  I asked him to keep
22  some of it somewhat liquid so if I wanted to buy
23  a house here eventually -- I never really wanted
24  to live in Florida, but if I wanted to buy a

Page 24

1  house, I could make a withdrawal at the time;
2  but that never happened.
3      Q.  Okay.  When was the next time you
4  invested any amount of money with Mike or one of
5  his companies?
6      A.  Just one month later.  Actually two
7  weeks later I put another 25,000 into that
8  particular fund, fund or whatever you want to
9  call it.  I trusted it with Mike.
10      Q.  So you're calling it a fund.  Was there
11  a specific account or specific fund you thought
12  you were investing your money into --
13      A.  No.  Fund was a misuse of the word.
14      Q.  When you were making these payments to
15  Mike or his companies, were you writing checks?
16  Were they wire transfers?  How was that working?
17      A.  I believe there were a little bit of
18  both.  I don't recall the specifics of each one
19  of those.
20      Q.  Did you ever give Mike or any of his
21  companies any amount of money through any other
22  means other than a check or money transfer?
23      A.  No, sir.
24      Q.  How about the next time, when was the

Page 25

1  next time that you invested any money with
2  Mr. Frantz?
3      A.  Well, that was in March of 2016 when my
4  IRA was liquidated.
5      Q.  So towards the end of 2013, you
6  invested 250, 100K and 25K?
7      A.  $425,000.
8      Q.  Right.  Total.  And then you didn't
9  invest any money with Mike or his companies
10  until March 2016 when you liquidated your IRA;
11  is that correct?
12      A.  Yes, that's correct.
13      Q.  Is there any reason that you stopped
14  investing money during those three years with
15  Mike or his companies?
16      A.  I didn't have the money to invest at
17  that point.  I was working and not saving.
18      Q.  You liquidated your IRA in March 2016.
19  How much money did you transfer to Mike or his
20  companies at that point?
21      A.  Do you want the exact dollar amount?  I
22  would have to stop and do some research, but it
23  was approximately --
24      Q.  If you can ballpark it, that's fine.

Page 26

1    A.  It was between 2.4 and 2.5 million.

2    Q.  And how did you transfer 2.4 to 2.5
3  million that was in your IRA to Mike or his
4  companies?

5    A.  That was wired.

6    Q.  Was that wired from one of your bank
7  accounts or directly from your IRA?

8    A.  From my checking account.

9    Q.  Where did you wire that 2.4 to 2.5
10  million?

11   A.  To Frantz Ventures.

12   Q.  When you wired any of these previous
13  investments, were you always wiring them to
14  Frantz Ventures, or did it change over time?

15   A.  I don't recall.

16   Q.  Do you recall any other account or the
17  owner of any other account to which you
18  transferred money or wrote a check?

19   A.  No, sir.

20   Q.  After you liquidated your IRA, I think
21  you made another investment, didn't you, life
22  insurance or something like that?

23   A.  Yeah, that was part of my IRA.  It was
24  part of the whole holding.  It was an IRA

Page 27

1  qualified insurance policy.

2    Q.  Did you make any other investments with
3  Mike Frantz or one of his companies after you
4  liquidated your IRA?

5    A.  No, sir.

6    Q.  When you liquidated your IRA and you
7  gave Mike the 2.4 to 2.5 million or one of his
8  companies I guess, did you ask him where that
9  money was going to be invested, or did he give
10  you any details about where that money would be
11  invested?

12   A.  Oh, yes.  He flew down before we did
13  that, and we had several meetings about what he
14  was doing.  Again, I can't give you specifics
15  about that, but Mike had various holdings within
16  his company Frantz Community Investors; and my
17  understanding from what Mike told me, that these
18  were going into investments in real estate that
19  had tax offsets that would offset the tax
20  liability of the liquidation because it would
21  have been income.  I wouldn't have had a penalty
22  because I'm an old man, but it would be income.

23   Q.  Did he tell you any specific properties
24  that had these historical tax credits we're

Page 28

1  talking about that he thought he would look into
2  investing your money into?

3    A.  He mentioned a few, yes.  There was a
4  hotel in Dubuque, a library in Fort Madison,
5  Hotel Jefferson in Iowa City, the Reklaw Hotel.
6  I specifically told him I told him not to invest
7  in the Northland Hotel which was in Wisconsin.
8  But I can't recall all the specifics.

9        Once again, I'm going to reiterate
10  that I trusted Mike implicitly at that point in
11  time that he would take care of it for me.  I
12  had no reason not to trust him.

13   Q.  What was your reasoning then for
14  telling Mike not to invest any money in the
15  Hotel Northland?

16   A.  Because I think the Northland, I think
17  he mentioned that it did not have any available
18  tax credits.

19   Q.  If I were to tell you that the Hotel
20  Northland did have available tax credits, would
21  that jog your memory?

22   A.  No.

23   Q.  I may be wrong about that, but my
24  understanding was that one did have tax credits.

Page 29

1        Okay, so several meetings before
2  March 2016 Mike flew down.  Were all these
3  meetings that you had with him before the
4  liquidation of the IRA in Florida?

5    A.  Yes, and over the phone.  We had lots
6  of conversations over the phone and emails.
7  There's an email trail that I'm sure you have.

8    Q.  What were you discussing in all these
9  phone calls and at these meetings?

10   A.  This investment in historic properties,
11  and there was also another one that we were
12  interested in doing here.  It became available.
13  An old building that's about 700 feet from here
14  called The Mansion.  It's a restaurant and
15  liquor store that is from 1890; and my neighbor
16  at that time -- they moved out this week
17  actually -- was involved in that and told me
18  about it; and I told Mike about it; and he said
19  I'm very interested in doing that.  So he came
20  down to look at it and to discuss it.  So we had
21  meetings with that person and the owner as well.

22   Q.  Is it your understanding -- sorry.  Go
23  ahead.

24   A.  He had meetings with them.  I did not.

Page 30

1  I was working.
2      Q.  Is it your understanding that this
3  Mansion property was a historical tax credit
4  opportunity?
5      A.  Yes, that it would be.
6      Q.  Do you know whether or not any of your
7  money ever got invested in The Mansion?
8      A.  I know it did not because Mike never
9  purchased that building.  He didn't follow
10 through.
11     Q.  Do you know if Mike or any of his
12 companies ever invested any money in that
13 building?
14     A.  I don't believe so.
15     Q.  Do you know why Mike or any of his
16 companies never invested in that building?
17     A.  I think subsequently the deal fell
18 apart.
19     Q.  Do you know why the deal fell apart?
20     A.  Mike didn't follow through on the deal.
21     Q.  How so?
22     A.  It took some time to happen, but he
23 just didn't follow through.  I don't know
24 what -- what are you asking me?  Specifics?

Page 31

1      Q.  I'm asking you what your understanding
2  of Mike didn't follow through on the deal is.
3      A.  He didn't show up for meetings.  He
4  just stopped communicating with the people with
5  the deal, and they had to go forward without
6  him.
7      Q.  Where were you getting this
8  information?
9      A.  From Mike and my neighbors.
10     Q.  Were your neighbors involved in
11 investing in that building then?
12     A.  They own it now.
13     Q.  They own it now?
14     A.  Yes.
15     Q.  How about this hotel in Dubuque and
16 this Hotel Jefferson you were talking about
17 earlier, did you know whether or not any of your
18 money ever got invested in those hotels?
19     A.  I do not.
20     Q.  Did you ever tell Mike specifically to
21 invest in any particular property?
22     A.  No, I trusted Mike.  I was assured that
23 my IRA portion of that investment would go to
24 properties that were eligible for tax offsets.

Page 32

1      Q.  And what's your understanding about how
2  that whole historical tax credits offsets would
3  work?  Can you kind of walk me through what your
4  understanding was, how that would all play out?
5      A.  Okay.  Remember, I'm not a physician or
6  lawyer -- excuse me, an accountant or lawyer.
7      Q.  Sure.
8      A.  My rudimentary understanding is that
9  there are investments that can be made from
10 taxable income that qualify for federal and/or
11 state offsets.  It's not a deduction.  It's an
12 offset that negates the tax consequences of
13 whatever the income source is for that
14 investment in that calendar year.  And I know
15 there are a lot of rules that apply to that in
16 the real estate world, but I don't know those
17 rules.  So that's my rudimentary understanding.
18     Q.  When you decided to make this -- to
19 liquidate your IRA and make this 2.4 to 2.5
20 million dollar investment, did you have a plan
21 at that point in time about when you wanted to
22 get your money out, what kind of return on your
23 investment you were looking for; or was it sort
24 of the same thing that you were just kind of

Page 33

1  playing it by ear?
2      A.  No, at that point Mike was assuring me
3  that he was going to bring me into his companies
4  as a partner.  I knew Mike's family really well.
5  They were partners in FCI; and he was going to
6  bring me in and structure this such that I would
7  be part of the company; and I was very
8  interested in learning about that world and
9  doing something new and different.
10          So the plan was to continue to
11 practice medicine but not full time, maybe go to
12 teaching, which I still plan to do when I
13 retire, and be in that world.
14     Q.  And then with respect to your
15 investment, did you have any plans on taking
16 that money out at any particular time, or you
17 were just going to partner up with Mike and then
18 kind of figure it out after that?
19     A.  No, I was guaranteed payments.
20     Q.  What were the guaranteed payments --
21     A.  Distributions at that point.
22     Q.  What were the guaranteed payments?
23     A.  $30,000 a month, 10 percent.  So I'll
24 explain this to you with -- and then you can --

Page 34

1  I don't know if you've read the emails, but they
2  are all drawn out in the emails when this was
3  going on, that the total accrual from my
4  previous investments combined with the IRA was a
5  little over $3.1 million at that point.  We
6  decided to make it an even 3 million, so Mike
7  wrote me a check for $105,600, something like
8  that; and the distributions were to be paid on
9  the first of every month at 10 percent, 30,000.
10      Q.  Was your understanding that at this
11  point in time that the $3 million you invested
12  with Mike and/or his companies were risk-free
13  investments?
14      A.  What do you mean by that?  Please
15  rephrase that for me.
16      Q.  When you gave Mike the $3 million, did
17  you have any understanding that it was possible
18  that you may lose some of that money?
19      A.  All investments have some risk, but I
20  had no reason not to trust Mike.  He'd always
21  done very, very well.
22      Q.  So how did these guaranteed $30,000
23  payments work then?  Was there a contract that
24  you signed and Mike signed that said that he

Page 35

1  would pay you $30,000 a month?
2      A.  No, this was an oral contract.  They
3  were -- I was hoping to get it memorialized.  I
4  was promised that it would be put into writing.
5      Q.  Did you ever get any of these $30,000
6  monthly payments?
7      A.  No.
8      Q.  After Mike paid you the $100,000 to
9  make your investment an even 3 million, did you
10  ever get any other money back on your
11  investments?
12      A.  He sent me sporadic -- by the way, that
13  check bounced.  He sent me --
14      Q.  The $100,000 one?
15      A.  Yep.  Yes.  Excuse me.  That check
16  bounced.  I got sporadic payments from Mike.  I
17  have not itemized them, and I don't have them
18  listed, but I would get an occasional check.  I
19  would say, half of those would bounce when I
20  would cash them.  They were returned
21  non-sufficient funds if you want to use a more
22  proper term; and a few of them went through; but
23  I never received a $30,000 payment.
24      Q.  How much were these checks that were

Page 36

1  either bouncing or you were cashing, roughly?
2      A.  Again, I can't recall the amount, but
3  anywhere between 5 and $15,000.  They were
4  lesser amounts and very unpredictable.
5      Q.  Did you ever ask Mike how come you
6  weren't getting paid this $30,000 a month?
7      A.  Yes.  There's a very long email trail
8  about the distress that began to build after
9  non-payments were made and the first check
10  bounced.
11      Q.  What was his answer to you at that
12  point in time?
13      A.  Well, Mike kept continuing to tell me
14  that things were going to be fine and that he
15  was working on it and everything was going to
16  turn out all right; and I continued to trust him
17  with his word until eventually I did not.  It
18  took a long time to destroy 50 years of
19  friendship and trust.
20          His family essentially raised me.
21  We were poor; and they used to have me over for
22  dinner when we didn't have enough to eat; and
23  his father was very close to me, as I didn't
24  have a father.  So I trusted Mike for a very,

Page 37

1  very long time.
2      Q.  Did you -- I think you said that you
3  also knew or trusted some of Mike's family
4  members; is that correct?
5      A.  Oh, yes.
6      Q.  Which family members?
7      A.  Tom mostly.
8      Q.  And did you know Tom all the way back
9  since you were children as well?
10      A.  I knew his whole family.  I spent time
11  at their home.
12      Q.  Do you know if Tom was involved in
13  these companies and with your investments?
14      A.  Tom was involved in the company.  I
15  don't know if Tom had personal money in it, but
16  he was involved.
17      Q.  Have you spoken to Tom since Mike
18  stopped paying you?
19      A.  No.
20      Q.  Is there any reason why you never
21  reached out to Tom?
22      A.  Mike was my friend.  I didn't have any
23  dealings -- Tom didn't owe me the money.  Mike
24  did.

Page 38

1    Q.  Was there anyone else that was working
2  for or with Mike during this period of time that
3  you spoke to about your investments?
4    A.  Not that I recall.
5    Q.  So we kind of touched on the fact that
6  you've sued Dean Price and McGladrey in Iowa; is
7  that correct?
8    A.  Yes.
9    Q.  How do you know Dean Price?
10    A.  Through Mike Frantz.
11    Q.  And how were you introduced to Dean
12  Price through Mike Frantz I guess is the
13  question?
14    A.  Dean Price has always been Mike's
15  accountant and helped him manage his companies.
16  That name has always been associated with Mike.
17    Q.  Did you ever get to know Dean Price on
18  a personal level?
19    A.  No, sir.
20    Q.  Have you ever spoken with Dean Price in
21  person?
22    A.  Yes, sir.
23    Q.  When was the first time you spoke with
24  Dean Price in person?

Page 39

1    A.  March the 1st, 2016.
2    Q.  And what was the occasion?  Why were
3  you speaking to Dean Price in person on -- in
4  March 2016?
5    A.  I'll give you a little background on
6  that.  When Mike came down in February to
7  describe the structure of liquidation of my IRA
8  and how to protect it from tax liability, Mike
9  told me that he and Dean Price had worked on the
10  structure of this together and that it would be
11  possible to -- that Mike had enough available
12  tax credits -- this is what Mike told me -- that
13  he could offset liquidation of my entire IRA and
14  that he and Dean had figured out to memorialize
15  it and structure this particular transaction to
16  the satisfaction of the IRS.
17         As we moved forward with that, I
18  became a little nervous, as you might imagine,
19  with my entire life savings; and I wanted to
20  confirm that Mike and Dean were on the same page
21  in terms of the structure and the assuredness of
22  the offset of my tax liability.  So before I
23  liquidated my IRA, immediately before that, I
24  asked Mike if I could just talk to Dean for a

Page 40

1  few minutes to make sure we were all on the same
2  page and that I was comfortable doing this.
3         So Mike contacted Dean and had
4  Dean reach out to me.  Dean called me.  I was
5  working.  Then I called Dean back, and we had a
6  conversation about what Mike was proposing.
7    Q.  When you had that conversation with
8  Dean, the way you phrased it was about what Mike
9  was proposing.  Is Mike a tax professional?
10    A.  No.
11    Q.  Is Dean Price a tax professional?
12    A.  Yes.
13    Q.  Was Dean following Mike's lead with
14  respect to these historical tax credits, or was
15  Mike following Dean's lead?
16    A.  I have no idea.  I know it was Mike's
17  idea to try to find a way -- we had tried this a
18  year earlier in a different methodology to find
19  a way that I could free up some of my IRA to
20  invest in the historic properties.  So I'm
21  assuming it was Mike taking the lead on that and
22  Dean structuring it.
23    Q.  Did you ever retain Dean Price or
24  McGladrey or RSM as accountants?

Page 41

1    A.  After my conversation and liquidation
2  of the IRA.
3    Q.  So did you have any tax professional
4  give you advice regarding the liquidation before
5  you did the liquidation?  Did you retain
6  anybody?
7    A.  No, sir.
8    Q.  After you liquidated your IRA, you said
9  you did retain Dean Price and RSM; is that
10  correct?
11    A.  Yes.  At the end of that conversation,
12  I asked him if he would also, as long as we're
13  doing this deal together and he's going to
14  structure it for Mike and myself, if he would be
15  my accountant as well, if I joined FCI at some
16  point on some level.
17    Q.  What did Dean say?
18    A.  Yes.
19    Q.  Did you ever sign any sort of
20  engagement agreement with McGladrey or Dean
21  Price?
22    A.  Yes, I did.  Yes.
23    Q.  When did you sign that agreement?
24    A.  Sometime in early March after the

Page 42

1  liquidation and wiring of the funds.
2      Q.   March 2016, right?
3      A.   Yes, sir.
4      Q.   Just to recap a little bit, you spoke
5  with Mike about this historical tax credit idea,
6  you told Mike that you wanted to speak to Dean
7  Price personally; is that correct?
8      A.   Yes.
9      Q.   And what was your reasoning as to why
10  you wanted to speak to Dean Price personally
11  rather than speak to Mike instead?
12     A.   As I said earlier, I wanted to make
13  sure that we were all on the same page before I
14  liquidated my IRA.
15     Q.   Was Dean Price in business with you
16  guys, or was he just the accountant for FCI and
17  Mike?
18     A.   I can't answer whether Dean Price had
19  investments with Mike personally.  So I don't
20  know that.
21     Q.   When you spoke to Dean personally in
22  March 2016, what did you ask him and what did
23  Dean say?
24     A.   I'll give you a summary of the

Page 43

1  conversation.  The conversation was over 20
2  minutes long, but essentially we talked about --
3  I was saying that Mike -- because we were
4  common -- he had a long relationship with Mike
5  and so did I.
6          Then I asked him to explain how
7  federal tax credits worked, and he did that.
8  And then I asked him if Mike's particular deal
9  flow at the time had the available tax credits
10  to offset the income tax consequences of my
11  liquidation.  And then I asked him if he could
12  structure -- and the answer was yes, that he did
13  have that information, that he did, indeed, have
14  the tax credits Mike told me were available.
15  And then I asked him if those tax credits would
16  be applied to my particular investment, in other
17  words, would the money flow to those entities.
18  And the answer was, yes, that he and Mike had
19  discussed that and whether or not he was able
20  to -- not whether or not but that he could
21  document those transactions to satisfy the IRS
22  that I wouldn't have a large tax liability from
23  the liquidation.  That's a summary of the
24  conversation.

Page 44

1      Q.   That last part, did Dean elaborate on
2  how he was going to do that, how he was going to
3  tell the IRS that, you know, these tax credits
4  would cover your tax liabilities?
5      A.   No, but I do remember -- no, he didn't
6  elaborate specifically.  He says that he -- he
7  told me, we do this all the time, quote unquote.
8  I said, are you sure this can be documented to
9  the satisfaction of the IRS when these moneys go
10  into the investments Mike was going to direct
11  them to.  And he said, yes, we do this all the
12  time.
13     Q.   Did you have any understanding
14  regarding when these historical tax credits
15  would be applied to your tax returns and the
16  particular tax year?
17     A.   In the year 2016.
18     Q.   So it was your understanding --
19     A.   That's when the income would be
20  incurred.
21     Q.   So it was your understanding that you
22  would be able to offset all of your -- all of
23  the tax liabilities from liquidating your IRA in
24  2016 with historical tax credits that would be

Page 45

1  available in 2016 or 2017?
2      A.   Yes.  Yes, sir, that was my
3  understanding.  That's what I was told by both
4  Mike Frantz and Dean Price.
5      Q.   After March of 2016 when you spoke to
6  Dean Price about liquidating your IRA and then
7  at some point in time around that time you
8  retained McGladrey and Dean Price as an
9  accountant, how often did you speak with Dean?
10     A.   I didn't speak with Dean at all.  I had
11  one more conversation with Dean before I wired
12  the funds because, again, I wanted to make sure;
13  and we just reiterated the previous conversation
14  that Mike did, indeed, have the tax credits as
15  he told me; that Mike was, indeed, going to
16  direct them into those investments which would
17  qualify to offset my account; and that Dean
18  could memorialize it to the satisfaction of the
19  IRA -- excuse me, IRS.  Sorry.
20     Q.   Did you ever, after March 2016, did you
21  ever ask Dean Price where he was at in getting
22  these tax credits memorialized for you?
23     A.   By email.
24     Q.   And did he respond?

JAMES LORES RADERS, 08/18/2021                                        Page 46..49

Page 46

1    A.  Very sporadically.
2    Q.  And what kind of responses were you
3  getting from him?
4    A.  That he would -- I mean, we can review
5  the emails if you'd like to present them.  I can
6  just give you a generalization, but I can't give
7  you specifics.  That he and Mike were going to
8  get together, and I think one of the emails said
9  he and Mike were going to get the ball rolling
10  on this.  And Mike said the same thing because I
11  was asking Mike at the same time.  You guys need
12  to get going on this because I'm going to suffer
13  the tax consequences in this year.
14    Q.  Right.  Did you ever pick up the phone
15  and call Dean Price and ask him how he was
16  getting the ball rolling, so to speak?
17    A.  I did not.  I was assured -- once
18  again, I still trusted Mike at this point,
19  although it was starting to fade in the
20  following months when no payments were made by
21  Mike.  But I still trusted him, and he said that
22  I promise Dean and I are going to work on this
23  and we're going to get this going.
24    Q.  When you originally spoke with Mike

Page 47

1  about investing some money with him or his
2  companies, what was your reasoning for wanting
3  to invest money with Mike, I guess, is the
4  question?
5    A.  He's my best friend and I trusted him.
6  He said we can do some things together; and,
7  like I said, I was interested in saving the
8  hearts of small towns.
9    Q.  And I'm looking back at my notes.  The
10  first one was around 2008 or '09, correct?
11    A.  Well, that was the South Cedar
12  Properties, yes.  That had nothing to do with
13  the subsequent small-town tax credit things,
14  investments.
15    Q.  So the small-town tax credit
16  investments started in 2010; is that correct?
17    A.  Yeah, the discussions about that really
18  started in 2013.
19    Q.  Gotcha.  So there was that $50,000
20  investment in 2010, but that wasn't really the
21  small-town tax credits.  The small-town tax
22  credits investments started in August 2013 when
23  you gave him 250K; is that correct?
24    A.  Yes, I believe we had discussions about

Page 48

1  what he was doing with small towns in 2010, but
2  it was really in earnest that he started talking
3  about the admission of FCI, which was formed --
4  I don't know when FCI's inception was, but that
5  was when it really became their mission -- or at
6  least that's what I understood.
7    Q.  In 2010 were you working at the private
8  practice in Minneapolis or were you already in
9  Florida?
10    A.  No, I was in my private practice in
11  Minneapolis.
12    Q.  What about in 2013?
13    A.  I was in Florida.
14    Q.  What was the reasoning for moving your
15  private practice in Minneapolis to Florida?
16    A.  I could give you a whole dissertation
17  on this, but the simple answer is the Affordable
18  Health Care Act.  A single physician -- I had a
19  single-physician subspecialty practice in
20  Minneapolis, and single-physician subspecialty
21  practices were disadvantaged significantly when
22  the Affordable Health Care Act passed.
23        And there was a person that I
24  knew -- we're a small academic community.  I was

Page 49

1  in academics for a long time, University of
2  Minnesota; and there was a small group of us
3  that knew each other; and somebody in Melbourne
4  where I'm living right now was in the same
5  situation and called me and said, listen, I can
6  move up there and be cold or you can come down
7  here and be warm, what would you like to do?
8  And so I joined him.
9    Q.  Because there were --
10    A.  It was very difficult to close my
11  practice and let my employees go.  It was very
12  difficult.
13    Q.  So was the thinking that under the
14  Affordable Care Act it was easier to make more
15  money or to do better in your practice if you
16  had a partner?
17    A.  It was easier to survive if you had a
18  partner.
19    Q.  Is it fair to say that when you moved
20  from Minneapolis to Melbourne, the medical
21  practice in Minneapolis wasn't doing so well?
22    A.  No, it's not fair to assume that.
23    Q.  Was one of the reasons that you moved
24  from your private practice in Minneapolis to

Page 50

1  Florida financially motivated?

2      A.  Well, as I said, the writing was on the

3  wall for single-physician practices.

4      Q.  I guess --

5      A.  So --

6      Q.  For the record, was the writing on the

7  wall meaning that the practice was going to

8  close down?  Was it that dire, or was it just

9  that you would be making less money?  What was

10  the writing on the wall?

11     A.  No, my suspicion was that the practice

12  would not be viable in the long term.

13     Q.  And when did you come to that

14  understanding?

15     A.  After the Affordable Care Act was

16  passed.

17     Q.  Was that in 20 -- I don't know.

18     A.  I can't recall the exact dates.

19     Q.  Somewhere between 2010 and 2013,

20  correct?

21     A.  Yeah, really -- 2011.  It was before

22  2011.

23     Q.  All right.  Did you ever have any

24  conversations with Mike about opening up an FCI

Page 51

1  office in Melbourne where you would become an

2  employee and owner, kind of like we were talking

3  about?

4      A.  Yeah, Mike mentioned -- I didn't bring

5  it up.  Mike mentioned that if we started an

6  investment in Florida, he would call it "FCI

7  East."  And as I said previously in my

8  testimony, at some point Mike committed that he

9  was going to bring me in as a partner once the

10  structure of my IRA investment was completed.

11  He even made it clear that he would pay my

12  health insurance eventually and, you know, get

13  the benefits that partners had at that time.

14  But there were no specifics.  My understanding

15  was that that was his intent, to bring me in as

16  a part owner of FCI.

17     Q.  Did you ever have any conversations

18  with Mike about a residential development in

19  Melbourne as well?

20     A.  Not that I recall.  We were talking

21  about a number of different opportunities down

22  the line.  We were brainstorming.  It would have

23  been a good idea.  This place has gone crazy.

24     Q.  What other properties down in Melbourne

Page 52

1  were you brainstorming with Mike about?

2      A.  Well, we looked at a fly shop that's

3  right across from the restaurant that was an old

4  building that could have been historic as well,

5  but that never got anything other than just some

6  superficial conversation.  We even talked about

7  a bed and breakfast somewhere, but I don't know

8  how that came up.

9      Q.  Did you ever have any conversations

10  with Dean Price or Mike about investment

11  properties that didn't have historical tax

12  credits but still presented tax advantages

13  through depreciation and things like that?

14     A.  I'd like you to repeat that and know

15  exactly what you're asking me, if you don't

16  mind.

17     Q.  Sure.  The question is, did you ever

18  have any conversations with Dean Price and/or

19  Mike Frantz regarding investment properties that

20  weren't necessarily historical tax credit

21  properties but did have tax advantages that

22  could be utilized through depreciation or things

23  of that nature?

24     A.  I don't recall specific conversations

Page 53

1  of that type.

2      Q.  Specifically when you hired Dean Price,

3  what did you hire Dean Price to do?

4      A.  I'm not sure that I hired Dean Price.

5  I signed an agreement with Dean Price that he

6  would be my accountant.  I suppose you could

7  call that hiring.  I thought Dean Price was

8  going to go forward with me as he did with Mike

9  when I became a partner in structuring and

10  shepherding me into FCI.  I guess I really

11  didn't know exactly when I hired him to be my

12  accountant I was going to become a partner.

13     Q.  Was it your understanding that you were

14  going to be paying Dean Price for his services

15  in one way or another?

16     A.  We never talked about that, but I would

17  assume if someone was rendering services to me

18  that there would be reimbursement.  But

19  actually, I think, Mike told me he would pay for

20  that service.

21     Q.  Did you retain McGladrey or Dean Price

22  to prepare or file your personal income tax

23  returns?

24     A.  He did for 2015, but that's not why I

Page 54

1  sought Dean Price's help at all.  That was a
2  sideline at the end of our conversation.
3      Q.  How did that come about?  Did you ask
4  him if he could do your 2015 return?  Did he
5  offer?
6      A.  I think he offered.  As long as I'm
7  going to be your accountant, I'll do your 2015
8  return as well.  That's not why I sought his
9  counsel.
10     Q.  Why did you seek his counsel, I guess,
11 is the question?
12     A.  I guess I can reiterate that to it's
13 the same as our conversations.
14     Q.  The same thing about the March 2013
15 conversation?
16     A.  That Mike -- yes, that's solely why I
17 sought him out initially.
18     Q.  I want to go through a few documents
19 with you, but maybe it's a good time for us to
20 take a quick break.
21     A.  Okay, I'm good for that.
22     MS. CAMMACK:  I agree with that.
23     MR. LANGS:  Do you want to come back at
24 12:15 my time?

Page 55

1      THE WITNESS:  That's fine for me.  Thank
2  you.
3      MR. LANGS:  Okay.
4      (Whereupon a recess was taken at
5      12:05 p.m. until 12:15 p.m.)
6      MR. LANGS:  On the record.
7      MS. REPORTER:  Okay.
8  BY MR. LANGS:
9      Q.  Jim, back on the record here.  I want
10 to show you a couple documents.  I think I'll be
11 done within the hour, if not much sooner than
12 that.  The first document I wanted to ask you a
13 few questions about, we'll mark as Exhibit
14 No. 1, this is our -- these are Defendant's
15 Requests to Produce to Plaintiff.  If you look
16 all the way into page 3, Certificate of Service,
17 it was sent to your counsel on August 3, 2021.
18 Do you see that?
19     A.  Yes.
20     Q.  We talked a little bit about these
21 complaints that you filed against Dean Price and
22 RSM in Iowa.  Who was your legal counsel in
23 those cases?
24     A.  Dutton and Dunne in Waterloo.

Page 56

1      Q.  All right.  Do you know why you filed a
2  case in federal court, dismissed it and then
3  filed a new case in state court in Iowa?
4      MS. CAMMACK:  I'm just going to object
5  on the record to the extent that that relates to
6  conversations that Jim has had with his counsel.
7      MR. LANGS:  Sure.
8      MS. CAMMACK:  I would advise him not to
9  answer.  If he can answer that question without
10 relying on any communication with that counsel,
11 then please feel free to answer.  But as it
12 relates to attorney-client privilege, I'll go
13 ahead and make that objection on the record.
14 BY MR. LANGS:
15     Q.  Sure.  And I should have prefaced my
16 questions about these cases, that I don't want
17 you to tell me about any communication that you
18 had with any attorney.  Does that make sense?
19     A.  Yes.
20     Q.  But to the extent you have personal
21 knowledge of something and you can answer my
22 questions, feel free to.  And if the answer is
23 only things that you -- about communications
24 with your lawyer, you can tell me that and we'll

Page 57

1  move on.
2      A.  That was -- the lawyer recommended
3  doing that, so that was communication from the
4  lawyer.
5      Q.  Well, don't tell me that.
6      A.  But I can't tell you why.
7      Q.  Yeah.
8      A.  I'm sorry, Brian.  I don't know the
9  rules.
10     Q.  No, no problem.  No problem.  Do you
11 have or do your attorneys have in that case
12 copies of the public filings, deposition
13 transcripts and/or the written discovery or
14 production documents in that case?
15     MS. CAMMACK:  Again, I would just note
16 the same objection.  I can either just do a
17 standing objection.  That's fine.
18     MR. LANGS:  Sure.
19     MS. CAMMACK:  Which is related to
20 anything that Jim has given to counsel or
21 communication with counsel.  So if everybody is
22 okay with a standing objection on that, we can
23 go ahead and limit my speaking on this.
24     MR. LANGS:  Sure, standing objection is

Page 58

1  fine.  And for this one, I would just say that I
2  don't think it's privileged, whether or not he
3  and his lawyers have certain documents in their
4  possession.
5  BY THE WITNESS:
6      A.  We have documents.
7      Q.  I guess, let me ask you this question:
8  You were deposed in one of these cases; is that
9  correct?
10     A.  Yes.
11     Q.  Do you know whether or not you ordered
12  a copy of the transcript of your deposition in
13  that case?
14     A.  Please restate the question.  The audio
15  just went out for me.
16     Q.  Do you know whether or not you or your
17  lawyers have ordered a transcript of the
18  deposition that you took in the Raders v. Dean
19  Price case in Iowa?
20     A.  I don't know that for sure because I
21  haven't seen my deposition yet.
22     Q.  Do you know at your deposition whether
23  or not you waived signature?
24     A.  I don't recall.

Page 59

1      Q.  Did somebody at the end of your
2  deposition ask you whether or not you wanted to
3  review your deposition testimony or would you
4  prefer to trust the court reporter, that she
5  took down everything that you said at that
6  deposition correctly and you were waiving
7  signature?  Does that ring a bell?
8      A.  I'm very sorry, it does not.  I'm
9  really sorry.
10     Q.  No problem.  No problem.  When was that
11  deposition?
12     A.  I really apologize.  We have so much
13  going on right now with trying to move.  That
14  deposition was in June, I believe, of this year.
15     Q.  Where was that deposition?  Was it done
16  via Zoom?
17     A.  It was done in person in Waterloo,
18  Iowa, at the offices of the attorneys.
19     Q.  I'm going to put this document away and
20  ask you a couple questions about -- you know
21  what, I have a couple more on that one.  So I
22  still have in front of you what's been marked as
23  Exhibit 1, the same request to produce that I
24  showed you earlier, Jim, and attached to your

Page 60

1  request to produce are a few exhibits.  The
2  first one are Plaintiff's Amended Rule 26
3  Disclosures in this case.  This is the Florida
4  case.  Do you see that?
5      A.  Yes.
6      Q.  I want to ask you a couple questions
7  about some of these names.  Who is Beth Simpson
8  and Thomas Simpson?  Do you know?
9      A.  I do not know.
10     Q.  Do you know who Daniel Olney is?
11     A.  No, sir.
12     Q.  How about Dwayne Capper?
13     A.  No, sir.
14     Q.  How about Gregory and/or Carol Hammann?
15     A.  I know the name.  I don't know the
16  people.
17     Q.  How do you know the name?
18     A.  When it became fairly apparent that
19  Mike was not going to honor our oral agreement
20  in terms of payments, my sister did a search,
21  and Hammann's name came up as filing a lawsuit
22  against Mike with a very similar story to mine.
23     Q.  Okay.  What about Jason Sharkey?
24     A.  Do not know that person.

Page 61

1      Q.  What about Doug Reichert or Jeremy Vos?
2      A.  I know the name Doug Reichert because
3  of football in Iowa.
4      Q.  Ah.
5      A.  Football people in Iowa are like rock
6  stars.
7      Q.  So I assume he played football at Iowa
8  University; is that correct.
9      A.  I believe so, with Mike.
10     Q.  Do you know who Kent Pilcher or Kirsten
11  LaFave?
12     A.  Yes.  Kent, I don't know Kent
13  personally, once again; but he was Mike's former
14  business partner.  I believe they had a company
15  a long time ago.  And Kirstein was Mike's
16  girlfriend at the time of our wedding in January
17  of 2017.  So I did meet her at the wedding.
18     Q.  Do you know when -- that was your
19  wedding in 2017 you were saying?
20     A.  Yes, sir.
21     Q.  Do you know when Mike was divorced?
22     A.  I do not, sir.
23     Q.  How about -- did I ask you about Larry
24  Brown already?

Page 62

1    A.  Larry Brown is a pretty generic name.
2    Q.  Right, yeah.  And I guess I should
3  have --
4    A.  I don't know if that's a specific -- we
5  had a high school buddy named Larry Brown, but I
6  don't know if that's him.
7    Q.  I guess I should rephrase the question.
8  The question is, do you know who these people
9  are with respect to events or allegations that
10  you may have in this lawsuit?
11    MS. CAMMACK:  I would just object as it
12  relates to discussions that he has had with
13  attorneys in my office as it relates to this
14  litigation and any intention about things that
15  have been filed in the course of this matter.
16  BY MR. LANGS:
17    Q.  Sure.  And all I'm asking you right
18  now, Jim, is whether or not you know these
19  people and how you know them.  Again, I don't
20  think that's going to be attorney-client
21  privileged, but don't tell me anything that you
22  discussed with your counsel.
23          Steve Gordon, do you know who that
24  is?

Page 63

1    A.  Don't know.
2    Q.  What about Thomas or Beth Vider?
3    A.  Do not know.
4    Q.  Do you know Keith Harenda?
5    A.  Mike mentioned his name as his
6  construction manager or something in the
7  Northland project, so I know the name.
8    Q.  Did Mike ever mention anything else
9  about Keith Harenda to you?
10    A.  Not that I recall specifically, but I
11  don't know that they had the best relationship.
12  That's my general recall.
13    Q.  Do you know why you recall him not
14  having a great relationship?
15    A.  I think there was some problematic
16  things at the Northland Hotel that surfaced
17  later, but I don't know the specifics.
18    Q.  This might be a good time to ask you
19  this question.  I assume at some point in time
20  before this lawsuit was filed and you were
21  trying -- you were asking Mike and you were
22  asking Dean, you know, when you might be getting
23  some of the return on your investment, did you
24  ever have a conversation with Mike regarding --

Page 64

1  you know, why Mike was unable to make these
2  payments he kept telling you that he was going
3  to make to you?
4    A.  We had a number of conversations.
5    Q.  What was his reasoning as to why he was
6  unable to make the payments that he kept telling
7  you that he would make?
8    A.  There were, many, many different
9  reasons given.  I never knew where my money was.
10    Q.  Did you ever ask him where your money
11  was, and what was his answer?
12    A.  Yes.
13    Q.  And what did he tell you?
14    A.  In various investments is all the
15  specifics I got.
16    Q.  This is a new document.  This is what
17  I'll have the court reporter mark as Exhibit
18  No. 2.  This is Defendant's Second Set of
19  Requests to Produce to Plaintiff.  Do you see
20  that?
21    A.  Yes, I can see it.
22    Q.  That's in this case too.  This is the
23  Middle District of Florida.
24    A.  And that's dated?

Page 65

1    Q.  I'm getting to that.  You're beating me
2  to the punch.  This one is dated August 17,
3  2021, so this was sent yesterday.
4    A.  Oh, so I'm not sure I've seen it yet.
5    Q.  What I wanted to ask you about was this
6  letter.  This is a letter that's attached to
7  Exhibit No. 2 as Exhibit A.  This is a letter
8  from RSM's general counsel's office; and it was
9  on September 10, 2020, to Michael and Susan
10  Frantz, care of Thomas Nitschke.  I think that
11  was one of the Mike's legal counsel at the time.
12  Have you ever seen this letter, or do you know
13  anything about this letter?
14    A.  No.  May you go back and explain, this
15  is a letter from --
16    Q.  Sorry.  This is a letter from McGladrey
17  or RSM's counsel to Michael and Susan Frantz,
18  care of their lawyer at some point in time.
19    A.  So why is it on RSM letterhead if it's
20  from their counsel?  Is it internal counsel?
21    Q.  It's their internal counsel, yeah.
22    A.  Okay.  Thank you.  Thank you.
23    Q.  Yeah.  So this is essentially -- I'll
24  represent to you this is a letter that Dean and

Page 66

1  RSM's lawyers sent to Mike regarding discovery
2  requests that your lawyers in the Iowa case sent
3  to RSM and McGladrey, and essentially what you
4  were asking for was a lot of documentation that
5  McGladrey and/or Dean Price may have had with
6  respect to their accounting relationship,
7  professional relationship with Michael and Susan
8  Frantz.  Does that make sense?
9      A.  Yes.
10     Q.  And my question for you is do you know,
11  do you have personal knowledge that McGladrey or
12  RSM or Dean Price or one of their lawyers
13  produced any of these documents that are listed
14  here?  I'll give you a chance to kind of go over
15  it.  You can just kind of shout it out if you
16  know.  And if you don't know any of them, that's
17  fine too.
18     A.  Produce documents for who?  I'm sorry.
19  I'm trying to follow.
20     Q.  So your attorneys, I believe, the
21  Dutton, Daniels, Hines, Kalkoff, Cook & Swanson;
22  is that correct?
23     A.  Okay.
24     Q.  Your attorneys sent RSM and Dean's

Page 67

1  attorneys requests for documents similar to what
2  we were just looking at in our case.
3      A.  Okay.  Thank you.
4      Q.  And questions.  In order for RSM and
5  McGladrey to respond to those requests either
6  with objections or requests that they keep the
7  documents confidential or things of that nature,
8  they contacted Mike and Susan because they
9  needed to get consent in order to produce any of
10  these documents to you or, you know, maybe they
11  didn't produce the documents to you, maybe they
12  objected.  I don't know.  That's what I'm trying
13  to get at.
14     A.  Okay.
15     Q.  So my question is, do you know, as you
16  sit here today, whether or not your Iowa lawyers
17  have ever received any of these documents that
18  were produced by -- that were requested from RSM
19  and McGladrey and would have been produced or
20  refused to be produced by them?  Does that make
21  sense?
22     A.  Yes.  I'm just trying to -- so in these
23  various entities, what documents are they
24  looking for?  Their tax returns?

Page 68

1      Q.  Any records relating to the preparation
2  of Michael and Susan Frantz's individual tax
3  return and records relating to the entities
4  identified below, which we were owned and
5  controlled by Michael Frantz.  So they're just
6  records that have to do with these entities.
7      A.  Okay.
8      Q.  Do you know -- and the question again
9  is, do you know whether or not McGladrey's
10  lawyers in this case have produced any documents
11  or records with respect to these entities that
12  are identified below right here, starting with
13  73 CHS Forwards?
14     A.  And that's the end of the list, Brian?
15     Q.  No, it's going to get longer, but let's
16  just start with these ones.
17     A.  I do not know, that I recall.
18     Q.  Okay.  How about any of these -- let me
19  back up a second.
20          Can you recall or do you know
21  whether or not McGladrey or RSM has responded to
22  your written discovery in the Iowa case with
23  either written objections or production of
24  documents?

Page 69

1      A.  Please repeat the question.  I'm sorry.
2      Q.  Do you know whether or not McGladrey's
3  attorneys in the Iowa case have responded to
4  your attorneys' -- what I call written
5  discovery, their interrogatories, production
6  requests, either with written objections and
7  responses and/or production of documents were
8  produced.  Do you know whether or not that's
9  been done in that case?
10     A.  I may have been told, but I do not
11  recall hearing that, and let me finish reading
12  the list, if you don't mind.  I only got a
13  little ways down.
14     Q.  Sure.
15          (Witness peruses document.)
16     A.  I don't recall seeing any documents
17  related to that.
18     Q.  So here are a couple other
19  considerations that McGladrey's attorneys wanted
20  to bring to the attention of Mike and Susan
21  Frantz.  Again, I guess, we can kind of skip all
22  this if your answer to the question is -- you
23  don't know whether or not any of these documents
24  have been produced; is that correct?

Page 70

1    A.  I do not recall, no.  If I know, I
2  don't recall any.
3    Q.  Well, let's move on then.  I'm opening
4  a third document, and we'll have the court
5  reporter mark this document as Exhibit No. 3.
6  This is a letter that's on FCI Frantz Community
7  Investors letterhead, and it's dated July 3,
8  2015.  It starts with Dear Investor.  It's
9  signed by Mike Frantz here at the bottom, and
10  it's one page.  Then the second page shows a
11  Legacy Investor Project Ownership Conversion
12  chart.  I'll kind of scroll down to show you
13  what it looks like.
14        My first question to you is, have
15  you ever received a letter like this, or did you
16  receive a letter like this from Mike Frantz or
17  FCI?
18    A.  No, sir.
19    Q.  Have you ever seen a chart like this
20  that you received from Mike Frantz or Frantz
21  Community Investors?
22    A.  No, sir.
23    Q.  Did you ever inquire with Mike Frantz
24  or anybody else at one of my Frantz's companies

Page 71

1  before or during or after you made these
2  investments we've been talking about today
3  regarding exactly how, you know, the whole
4  project or the whole investment portfolio worked
5  out?
6    A.  No, sir.  I trusted Mike implicitly.
7  Mike just got all my trust.  He did really well.
8  Showed me a $27 million net worth statement,
9  flew down in a private jet to see me, always
10  dressed nice, flew first class.  I trusted him
11  that he was doing well.
12    Q.  Is it your opinion that Mr. Frantz is
13  somehow hiding money that he has that he could
14  use to pay you back for your investment?
15    MS. CAMMACK:  Well, I'm going to object
16  on the basis of it's a very speculative
17  question.  I mean, I feel like there is no
18  foundation laid on it.  But I guess to the
19  extent that, Jim, you can answer it and noting
20  that it's speculative in nature, then go ahead.
21  But that would be my objection on that type of
22  questioning.
23  BY MR. LANGS:
24    Q.  And, Jim --

Page 72

1    A.  I'll answer this question.  Go ahead,
2  Brian.
3    Q.  I was going to say, after your counsel
4  objects, unless it's an attorney-client or
5  there's a direction to tell you not to answer,
6  if you're able to answer the question, you can
7  go ahead.  That's what I was going to say.
8    A.  I don't have an opinion about whether
9  or not he has enough money to pay me back.  I do
10  have, based on Mike and I's close friendship and
11  showing me in the beginning that he would never
12  let me go down (inaudible).
13    MS. REPORTER:  I'm sorry, Mr. Raders,
14  but your audio went out for me.
15  BY MR. LANGS:
16    Q.  Yeah, I can't hear you either.
17    A.  Oh, really?  It says my internet
18  connection is unstable.  I don't know why.  Am I
19  there?
20    MR. CAMMACK:  Yeah, it's better now.
21    THE WITNESS:  I just got a message on my
22  computer that my internet connection is
23  unstable.
24

Page 73

1  BY MR. LANGS:
2    Q.  It's better on my end now too.
3    A.  Okay.  Can you hear me now?
4    Q.  Yeah.
5    A.  I don't have an opinion on whether or
6  not he can pay me back.  I just have a question
7  as to as close as we were and Mike's guarantees
8  to me that he would never let me go down before
9  he went down, how he's able to hire a high-class
10  attorney like you, where is the money coming
11  from?
12    Q.  So the fact that he's able to hire an
13  attorney is one reason you think he may have
14  some money; but other than that, is there any
15  other reasons that you think that Mike Frantz is
16  either lying or being untruthful about saying
17  that he lost all his money as well?
18    A.  I don't know where my money ever went.
19  So I know that -- I doubt highly my money ever
20  went to where Mike (inaudible)...
21    (Discussion had off the record and
22     witness reconnecting to deposition.)
23    MR. LANGS:  Can you read my last
24  question and the part of the answer that you

Page 74

1  got?
2          (Requested record read.)
3  BY THE WITNESS:
4      A.  Mike stills owe me the money.  I don't
5  know where it went, but I don't know if he has
6  it.  I have no idea.
7      Q.  All right.  Did you ever, in 2016, seek
8  tax advice for the specific purpose of
9  determining whether and how to provide
10  investment funds to another -- let me strike
11  that.  Strike that.
12          Did you ever seek tax advice from
13  McGladrey or Dean Price for the specific purpose
14  of determining how to provide investment funds
15  to Mike Frantz or one of his companies?
16      A.  Can you clarify that?  Are you talking
17  about independent of the phone call we
18  discussed?
19      Q.  Yes.  Yes.  Independent of the phone
20  call or maybe not.  I guess my question is, did
21  you ever seek out yourself tax advice from
22  McGladrey or Dean regarding how or the best way
23  to provide any investment funds that you were
24  going to give to Mike Frantz or his companies?

Page 75

1      A.  Not outside the phone -- no, is the
2  answer.  Not outside the phone call that we had.
3      Q.  Did you ever ask specifically ask McGladrey
4  or Dean Price during that phone call whether and
5  if you should and the best way to do so to
6  provide investment funds to Frantz and the
7  Frantz entities?
8      A.  No, the phone call was limited to my
9  previous testimony as to what the content was.
10      Q.  At any time before or after that phone
11  call did you ever ask Dean Price or RSM whether
12  or not you should invest money with Mr. Frantz
13  or his companies and, if so, what would be the
14  best way to provide the investment funds to
15  Mr. Frantz or his companies?
16      A.  No, I did not.
17      Q.  Did you ever tell Dean Price or anyone
18  else at McGladrey that you wouldn't proceed with
19  liquidating any of your retirement accounts and
20  investing those moneys with Frantz or his
21  companies unless you got Dean Price's specific
22  advice and confirmation as an accounting and tax
23  services professional?
24      A.  Please clarify that for me.

Page 76

1      Q.  Did you ever tell -- let me just
2  rephrase it.
3          Did you ever tell Dean Price or
4  RSM that you would not or could not proceed with
5  liquidating your IRA account and investing the
6  moneys with Frantz or his companies unless and
7  until Dean Price or somebody else at McGladrey
8  offered you specific advice and confirmed that
9  the tax credits were available and you were
10  getting that advice from them as a tax services
11  professional?
12      A.  Not independent of the conversation,
13  again.  My conversation was my contact with Dean
14  Price and RSM.
15      Q.  Did you ever have email communications
16  with Dean Price and RSM?
17      A.  I did, as preparatory to the
18  conversation.
19      Q.  So is your testimony that you never
20  emailed or spoke on the phone with Mr. Price and
21  asked him to directly confirm that, if you
22  liquidated your IRA, that the funds would be
23  used in Mr. Frantz's transactions or Frantz
24  company transactions in a manner that would

Page 77

1  provide you with sufficient tax credit benefits?
2      A.  That's what happened during the phone
3  call is that --
4      Q.  Did you specifically ask Dean Price
5  that you needed his confirmation as a tax
6  services professional before proceeding with
7  that liquidation of your IRA and investment with
8  Mr. Frantz?
9      A.  No, I relied on Dean -- I'm not sure
10  what you're asking me.  You need to be more
11  specific.
12      Q.  Sure.  My question is -- let me
13  rephrase it a little bit more.  My question is a
14  yes or no question.  Did you ever ask Dean
15  Price -- let me rephrase.
16          Did you ever ask Dean Price to
17  confirm, as a tax services professional, that
18  Mr. Frantz would be able to invest your money
19  from your IRA in transactions with tax credit
20  benefits that would offset your federal tax
21  liability?
22      A.  I did ask him that.  I asked him, A,
23  were those tax credits available to offset my
24  investment with he and Mike -- with Mike; B,

Page 78

1  would they be used for that purpose; and, C,
2  could he memorialize that to the satisfaction of
3  the IRS.  That was what our conversation was.
4      Q.  Did you ever also tell Dean Price that
5  you would not proceed with the investment unless
6  you received his specific advice and
7  confirmation as an accounting and tax services
8  professional that your investment moneys would
9  be used in transactions or in a manner that
10  would provide you with these tax credit
11  benefits?
12      A.  I don't specifically recall telling him
13  that.
14      Q.  I'm just going through my notes here.
15  I might have a couple more, and then I'll be
16  done.
17          Is it fair to say that you would
18  not have liquidated your lifesavings and
19  retirement accounts or cashed out your life
20  insurance policy to invest those moneys with
21  Mr. Frantz or his companies unless Dean Price
22  and/or McGladrey gave you advice as a tax
23  professional to do so?
24      A.  I don't think I would have if Dean

Page 79

1  Price had said at that point, we don't have
2  those tax credits, we can't apply them to your
3  IRA, and we can't document that as Mike Frantz
4  told me.  If he told me Mike Frantz was lying to
5  me, then I probably wouldn't have liquidated my
6  IRA, but that's not what happened.
7      Q.  Would you -- is it fair to say that
8  Dean Price directed you to liquidate your
9  lifesavings in your retirement accounts and
10  directed you to cash out your life insurance
11  policy so that those moneys would be available
12  for you to invest with Mr. Frantz's companies?
13      A.  No, he didn't tell me to do that.
14      Q.  Did Dean Price or anyone else at
15  McGladrey ever provide you with pros and cons or
16  risk assessment with respect to the possibility
17  that you may lose some or all of the funds that
18  you invested with Mr. Frantz's companies?
19      A.  No.
20      Q.  Did you expect that Dean Price and/or
21  McGladrey, as tax professionals that you
22  retained, they would be the people that would
23  provide documentation to the IRS to demonstrate
24  that appropriate measures were taken and the

Page 80

1  requirements were met in order for you to offset
2  your tax liability which resulted from
3  liquidating your retirement account?
4      A.  I was told that Mike and Dean would do
5  that as a team.
6      Q.  And who told you that?
7      A.  Mike and Dean.
8      Q.  Did you -- I know you said that you
9  trusted Mike and that he was a good friend and
10  you thought he was successful.  Did you have any
11  reason to believe that Mike had any credentials
12  or certifications in accounting or otherwise was
13  experienced enough to act as a tax professional
14  to give you tax advice?
15      A.  Other than that he had an MBA and he
16  was doing tax-directed investments, I would
17  assume he knew a lot more about it than I did.
18      Q.  Were you aware at the time you were
19  discussing these investments with Mr. Frantz
20  that Mr. Frantz himself had retained Dean Price
21  and McGladrey as his own tax professionals and
22  as the company's tax professionals because he
23  didn't have the expertise to give that sort of
24  advice?

Page 81

1      A.  You're leaving out the last.  I knew
2  that Dean Price and McGladrey were Mike's
3  accountants for as long as I knew Mike in
4  business.
5      Q.  So as long as you had known Mike in
6  business, he had been using professional
7  accountants --
8      A.  Price.
9      Q.  -- with tax advice and accounting
10  services; is that correct?
11      A.  Yes.
12      Q.  Two more notes to go through, and I'll
13  let you go here.  Whose idea was it to ask Mike
14  Frantz or FCI to sign the investment agreement
15  that is attached as an exhibit to your complaint
16  in this case?
17      A.  It came out of a phone call between my
18  sister Lou who became quite concerned, as my
19  sister and also as a real estate lawyer, when
20  things were not being documented and paid.  She
21  had a conversation with Dean Price and Mike
22  Frantz that I was not present on, and I believe
23  out of that conversation came the investment
24  agreement.

Page 82

1    Q.  Did you say that your sister was an
2  attorney?
3    A.  Yes.
4    Q.  Had you retained her to represent you
5  with respect to negotiations with Mr. Frantz
6  and/or Mr. Price and McGladrey with respect to
7  these investments that you had made?
8    A.  There's a very fine line between being
9  a sister with expertise and being a lawyer and a
10 sister.  Which one do you put first?  She began
11 acting as a legal counsel for me in, I believe,
12 April of 2016.  And, therefore, she structured
13 the investment agreement.
14   Q.  Were you paying your sister for any of
15 the legal services that she was providing you
16 with respect to discussions and/or negotiations
17 with Mr. Frantz and his companies and/or
18 Mr. Price and RSM?
19      MS. CAMMACK:  I'll just have to object
20 on the basis of that might impede the
21 attorney-client relationship as to the nature of
22 the relationship, payments included.  And I want
23 to represent that -- and I can send it to you if
24 you would like to see it -- there was an order

Page 83

1  entered in what I'll call the Iowa matter that
2  states that his sister Lou Raders did make an
3  appearance of her representation on June 20,
4  2016, as it relates to emails; and the court had
5  ordered that any communications written or oral
6  between Jim and Lou on or after June 14 are
7  protected by the attorney-client privilege and
8  need not be produced.
9      So I'm just putting that out there
10 just for the purposes of continued questioning.
11 Again, if it's outside of that scope, please, if
12 you can answer, go ahead.  I just wanted to put
13 that on the record.
14 BY THE WITNESS:
15   A.  Prior to June -- prior to that date I
16 had not paid her.
17   Q.  Okay.  Do you know whether or not Mike
18 Frantz or FCI had retained legal counsel for
19 purposes of negotiating this investment
20 agreement with you and/or your sister?
21   A.  I have no knowledge that he engaged an
22 attorney to enter into that agreement.
23   Q.  Have you ever met or do you know the
24 name of any attorneys that Mr. Frantz had

Page 84

1  engaged for purposes of running his business
2  while you were making -- while you were
3  investing with him?
4    A.  I've heard him use the name Scott
5  Sissel before as a person he has engaged as an
6  attorney.
7    Q.  Was your understanding as of March 2016
8  when you decided to liquidate your IRA account
9  and invest the money that was in the account
10 with Mr. Frantz and/or his companies that the
11 money that you were investing was an investment
12 rather than a loan?
13   A.  Yes, it was my understanding that was
14 an investment.
15   Q.  Was it your understanding that the
16 difference between an investment and a loan is
17 that an investment carried some risk for maybe a
18 higher percentage chance of -- a higher rate of
19 return versus a loan as money that Mr. Frantz
20 would have been contractually required to pay
21 back at a contractually stated interest rate?
22   A.  As you can tell, I'm not particularly
23 financially sophisticated.
24   Q.  Let me rephrase the question.

Page 85

1    A.  Okay.
2    Q.  As a layman, what's your understanding
3  of the difference between an investment and a
4  loan?
5    A.  Just what you said, that an investment
6  carries a higher risk and higher rate of return
7  and that a loan has usually a fixed rate of
8  return and lower risk.  Although loans can be
9  risky depending on who they're guaranteed by,
10 even the FDIC.
11   Q.  Is it fair to say that the person or
12 entities that you would invest money with don't
13 necessarily have any obligation to pay you back
14 the money that you invested?
15   A.  I think with Mike and I's oral contract
16 that he did have an obligation to pay me back at
17 a rate of 10 percent.  That was my understanding.
18   Q.  Was that your understanding with
19 respect to all the investments going back to
20 2008 and 2009 that we talked about today?
21   A.  Yes.  I never doubted Mike would not
22 pay me back, I guess.  It never even entered my
23 mind.  I trusted him that much.
24   Q.  Trust is one thing, but did you ever

JAMES LORES RADERS, 08/18/2021                                    Page 86..89

Page 86

1  have any doubt or did anybody else in your
2  circle of advisors ever tell you that, you know,
3  there was risk, in making an investment that you
4  may lose money when you make an investment
5  rather than make money?
6      A.  I didn't doubt at the time that I would
7  not be paid back.
8      Q.  And that was based on your trust --
9      A.  My life-long --
10     Q.  -- in Mike's abilities?
11     A.  My life-long relationship with Mike,
12  the net worth statement he showed me, the
13  success he appeared to have.  He never -- I had
14  never had any indication that he was in any kind
15  of trouble.
16     Q.  You knew Mike since you were little
17  kids, correct?
18     A.  12 years old.
19     Q.  And how old were you when -- in March
20  2016 through, you know, March 2017?
21     A.  How old was I?
22     Q.  Yeah.
23     A.  Well, I was 62.
24     Q.  62.  During that time from when you

Page 87

1  were 12 years old until you were 62 years old
2  and you were close friends with Mike, did you
3  ever know Mike or his family to be having any
4  type of financial or money problems?
5      A.  I did not know, no.
6      Q.  During that time and until you made
7  those investments with him and he wasn't able to
8  pay you back a return on your investments, did
9  you ever have any reason to believe that, you
10  know, Mike was selling off property or wasn't
11  driving as nice of a car or wasn't flying a
12  private jet as much as he was or anything of
13  that nature?
14     A.  I didn't see that.
15     Q.  I know that you mentioned that when he
16  came down to Florida for that one meeting you
17  were talking about earlier about The Mansion and
18  about making this IRA investment, that he flew a
19  private jet down there to meet you down there;
20  is that correct?
21     A.  No, that was many years before.  He
22  flew commercial that time.
23     Q.  Was it his -- was it your understanding
24  that it was Mike's practice to fly private when

Page 88

1  he was traveling around the country for
2  business, or was that a special occasion where
3  he came down there and met you that one time on
4  the private jet?
5      A.  I don't really know.  I think it was
6  probably a special occasion, but I'm
7  speculating.
8      Q.  Have you ever flown in a private jet
9  with Mike?
10     A.  No.
11     MR. LANGS:  Let me check one more thing.
12  I think that's all I have.  Do you have any
13  questions, Krista?
14     MS. CAMMACK:  Yes, I will.  I don't know
15  if this is a good time, like if anybody needs a
16  comfort break before I start.  I just want to
17  put that out there for the group.
18     MR. LANGS:  Are you planning on going a
19  long time?
20     MS. CAMMACK:  Probably we'll cover a few
21  topics.  Famous last words to say how much time
22  it's going to take.
23     MR. LANGS:  Sure.  If it's going to be
24  an hour, I might take a break; but if you're

Page 89

1  going to be done in 20 minutes, I'm good.
2      MS. CAMMACK:  It will probably be more
3  than 20 minutes.
4      MR. LANGS:  Do you want to take five
5  minutes, ten minutes?
6      MS. CAMMACK:  Let's just do ten to be on
7  the safe side.
8      THE WITNESS:  Okay.  See you then.
9      MS. CAMMACK:  Thank you.
10     (Whereupon a recess was taken at
11     1:12 p.m. until 1:22 p.m.)
12     CROSS-EXAMINATION
13     by Ms. Cammack:
14     Q.  All right, Jim, we're on the record.
15  I'm going to ask you some questions now.  I
16  apologize in advance.  They might go a little
17  out of order from what you were asked on direct
18  questioning by Mr. Langs, so I do apologize if
19  they're not entirely fluid.  And I'm going to
20  continue just using Jim and Mike just for
21  consistency purposes for everyone.
22     So I know early on in your
23  deposition today you discussed, I believe, a
24  2008 through what I'll say is 2013 investment

Page 90

1   for business dealings with Mike.  Do you recall
2   that testimony?
3       A.  Yes.
4       Q.  Okay.  And in those, it doesn't appear
5   that you received any documentation from Mike.
6   You said that, you know, you trusted him
7   implicitly and that he would enter the money
8   into different investments within his company;
9   is that correct?
10      A.  Correct.
11      Q.  Was the what I'll call the 2016
12  investment of March 2016, was that different, in
13  your mind, than the prior investments?
14      A.  Yes.
15      Q.  Okay.  And how would you characterize
16  it as being different?
17      A.  It was all chips on the poker table in
18  the center.  It was everything I had plus it
19  would have resulted in a very, very large
20  consequence with the IRS.
21      Q.  So you asked more questions; would that
22  be correct?
23      A.  Yes.
24      Q.  And you had specific areas and places

Page 91

1   in which you wanted this money to go; is that
2   correct?
3       A.  Well, I wouldn't put it that way.  I
4   wanted the money -- I was guaranteed that it was
5   going to go to investments that would offset the
6   IRS consequences.  That was my requirement.  I
7   still trusted Mike as to where those particular
8   entities would be.  So the only thing I did ask
9   him was not to do the Northland Hotel.
10      Q.  Would it be correct, and correct me if
11  I'm wrong, to say that you did not give Mike
12  free reign with how to use your money?
13          MR. LANGS:  Objection.  I think that
14  mischaracterizes the testimony.
15  BY MS. CAMMACK:
16      Q.  I'm just asking.  Knowing what -- your
17  prior testimony, what you just said, that you
18  thought it would go to tax credit and would have
19  the offset, would it be correct to say that you
20  had specific ways in which Mike was supposed to
21  use the money, therefore, he was not entitled to
22  use it in any manner that he personally chose to
23  do so?
24      A.  Yes, but Mike guaranteed me he was

Page 92

1   going to put that money into investments that
2   would be offset by tax credits.
3       Q.  Okay.  So then at some point you
4   mentioned that he provided you with a personal
5   financial statement, correct?
6       A.  He did.
7       Q.  And did he personally provide that to
8   you?
9       A.  Yes.
10      Q.  And do you recall this document?  I
11  just want to ask that first question.
12      A.  I vaguely recall the document.  It was
13  he and Susan's financial statement.
14      Q.  Okay.  And is it your understanding,
15  and I think you mentioned earlier, that it was
16  approximately a net worth of about $27 million?
17      A.  Yes.
18      Q.  So that $27 million would cover the
19  investment that you -- and I'm calling it an
20  investment just because that's what was done in
21  your prior testimony, but the investment that
22  you gave to Mike in March of 2016, correct?
23      A.  If it was liquid, yes.
24      Q.  Prior to sending the money to Mike or

Page 93

1   one of Mike's entities in March of 2016, did he
2   ever advise you that he was involved in
3   litigation?
4       A.  No.
5       Q.  When was the last time you spoke to
6   Mike?
7       A.  Personally spoke to him, I think it was
8   2018, maybe 2019.  It's been a couple years since
9   I've spoken to him.
10      Q.  So at any time between 2008 and 2018,
11  did Mike advise you that he was involved in
12  litigation?
13      A.  No.
14      Q.  Were you aware of any judgments that
15  were entered against him between 2008 and 2018?
16      A.  Well, we subsequently became aware of
17  that, of the litigation.
18      Q.  But you did not learn of those from
19  Mike specifically?
20      A.  No.
21      Q.  At some point you provided Mike, one of
22  his entities, with money, correct -- strike
23  that.
24          In March of 2016 you provided Mike

JAMES LORES RADERS, 08/18/2021                                Page 94..97

Page 94

1  with money, correct?
2      A.  Yes.
3      Q.  Where did you transfer that money to?
4      A.  Frantz Ventures is where it was wired.
5      Q.  And who told you to wire it to Frantz
6  Ventures?
7      A.  Mike.
8      Q.  Have you ever been told what your money
9  was used for?
10     A.  No.  Well, I was, yes.  He said in
11  generalities it was used for investments.
12     Q.  But specifically you don't know --
13     A.  No.
14     Q.  -- where your money was sent?
15     A.  No.
16     Q.  Did you ever advise Mike or anyone with
17  any of his entities that he could use your money
18  for personal matters?
19     A.  No.
20     Q.  How about did you ever hear from Mike
21  or did you tell Mike I should say or anyone in
22  his entities that he could use your money to pay
23  other investors?
24     A.  No.

Page 95

1      Q.  If money was used to pay RSM, is that
2  something that you would have advised him that
3  he had the authority to do with your money?
4      A.  No.
5      Q.  How about if there was a payment made
6  to the University of Iowa, is that something
7  that you would have allowed him to do with your
8  money?
9      A.  No.
10     Q.  And the same question as it relates to
11  a student loan payment, would you have allowed
12  that or advised him that he could do that?
13     A.  No.
14     Q.  And the same question as it relates to
15  an auto loan payment, have you ever said that he
16  could do that with any of the money that you
17  provided?
18     A.  No.
19     Q.  Prior to this litigation, were you
20  aware that the money that you wired in this same
21  month was also the same month used at some
22  point -- there was a payment to University of
23  Iowa, a student loan, or an auto loan payment?
24     A.  No.

Page 96

1      Q.  I'll just say regardless of whether we
2  call it a loan or investment or however we want
3  to couch it, you entered into an investment
4  agreement with FCI and Mike individually,
5  correct?
6      A.  Yes.
7      Q.  And is it your understanding that this
8  agreement obligated not only FCI but also Mike?
9      A.  Yes, it says Mike personally.
10     Q.  Is it your understanding that the
11  investment agreement required Mike to account
12  for the funds which you provided him in March of
13  2016?
14     A.  Yes.
15     Q.  And was that done?
16     A.  No.
17     Q.  Was it your understanding that, per the
18  agreement, he was to invest the funds in
19  investments that were approved by you and which
20  would provide you with the tax credit to offset
21  the tax liability?
22     A.  Yes.
23     Q.  And was that done?
24     A.  No.

Page 97

1      Q.  Is it your understanding that the
2  agreement required him to pay you interest?
3      A.  Yes.
4      Q.  And was that done?
5      A.  No.
6      Q.  And is it your understanding that the
7  agreement provides that, if funds were not
8  invested in the investments meeting your
9  approval by December 31 of 2016, then you would
10  have the right to a full return of the funds?
11     A.  Yes.
12     Q.  Were you satisfied with the investments
13  and, therefore, giving your approval by
14  December 31, 2016?
15     A.  No.
16     Q.  So your understanding is you would have
17  the right to a full return of the funds,
18  correct?
19     A.  Yes.
20     Q.  And have you asked for a full return of
21  the funds?
22     A.  Eventually, yes.
23     Q.  And has that been given to you?
24     A.  No.

JAMES LORES RADERS, 08/18/2021                          Page 98..101

Page 98

1      Q.  Regardless of Mike's current financial
2  situation, does he or one of his entities still
3  owe you money?
4      A.  Yes.
5      Q.  And they haven't paid that to you,
6  correct?
7      A.  No.
8      Q.  Has he ever admitted that he owes you
9  money?
10      A.  Yes.
11      Q.  And how has he -- in what way?  Was
12  that through phone, through email?
13      A.  I can't recall the specifics.  However,
14  I know he told one of our mutual high school
15  friends that he owed me money and he wished he
16  could pay me.
17      Q.  Would you have engaged in this -- I'll
18  call it a transaction, deal, if you weren't
19  going to get the tax credit?
20      A.  No.
21      Q.  Would you have engaged in the deal if
22  it wasn't going to be properly documented for
23  you?
24      A.  No.

Page 99

1      Q.  Same question, would you have engaged
2  in the deal if Mike told you, I'm going to be
3  unable to tell you where your money went?
4      A.  No.  That goes to the last question
5  about being documented.
6      Q.  Okay.  And on that, have you ever
7  received a receipt or any form of documentation,
8  an invoice, anything to show, hey, I used your
9  money for this?
10      A.  No.
11      Q.  So as far as you know, you gave money
12  and it just -- you have just never been given
13  the money back and you have no idea -- nobody's
14  been able to tell you where it went?
15      A.  No.
16      Q.  It's somewhat on the lines of my first
17  kind of question here but, would you have done
18  this deal if Mike and Dean Price, RSM, would
19  have told you that you would get the tax
20  credits?  I know that's kind of on the same line
21  of my previous question.  I just want to make
22  sure I got it.
23      A.  I wouldn't have done it.
24      Q.  You wouldn't have done it, okay.  I'm

Page 100

1  just looking through my notes here.
2          The investment agreement, I know
3  you mentioned that Mike, Dean, and Lou had a
4  conversation, and that was the document that
5  came from it, correct?
6      A.  I think that document came after that
7  conversation.
8      Q.  After that conversation.
9      A.  I wasn't present at the conversation.
10      Q.  Correct.  Correct.  Is it your
11  understanding that the investment agreement
12  reflects the agreement that you had with Mike
13  prior to that document, so it accurately
14  reflects the oral agreement that you had?
15      A.  Yes.
16      Q.  I actually think I've surprised myself,
17  and we got true those much quicker than I
18  thought.  So I do not have any further
19  questions.  I will leave it to Mr. Langs to see
20  if he has any follow-up.
21          MR. LANGS:  Just a couple.
22
23
24

Page 101

1          REDIRECT EXAMINATION
2              by Mr. Langs:
3      Q.  Jim, Krista just asked you about this
4  personal financial statement that Mike Frantz
5  provided to you at some point in time.  When he
6  provided that personal financial statement to
7  you, did you have any reason to believe that the
8  numbers in the personal financial statement were
9  untrue?
10      A.  No.
11      Q.  I think you also said something along
12  the lines of if the 27 million, which was
13  referenced in the personal financial statement
14  was liquid, then Mike would have had enough
15  money on hand at that time to pay you back on
16  your investment personally; is that correct?
17      A.  Yes.
18      Q.  At the time he gave you or provided
19  that personal financial statement, did you think
20  or did you have an understanding that the 27
21  million that was referenced in that personal
22  financial statement was, indeed, liquid?
23      A.  I didn't have any idea what the state
24  of liquidity was.

Page 102

1    Q.  Did you look at the personal financial
2    statement at the time he gave it to you?
3    A.  Yes, but I don't have it in front of
4    me.  If you want me to go through it, I could do
5    that; but I don't recall what part of it was
6    liquid or not liquid or what they -- how liquid
7    it is or how easy it would have been to
8    liquidate.
9    Q.  As you sit here today, do you recall
10   thinking that you wouldn't have made the
11   investments with Mike that you did if he didn't
12   have enough liquid cash personally on hand to
13   pay you back if things went south?  Was that
14   part of your investment decision?
15   A.  No, sir, that's not what I'm saying.  I
16   trusted Mike.  My mind wouldn't even have gone
17   there I had so much trust in him at the time.
18   Q.  I think you also just testified when
19   your counsel was asking you questions that Mike
20   didn't really tell you where or how he invested
21   the money that you invested with him, but in
22   generalities, Mike told you that your investment
23   money was being used in real estate investment
24   projects; is that correct?

Page 103

1    A.  Yes.
2    Q.  I think your counsel was also asking
3    you whether or not Mike had free reign to invest
4    money that you invested with him in the
5    different investment -- real estate investment
6    projects as he saw fit.  Is it your testimony
7    that he did not have free reign to do so, or how
8    did it work then?
9    A.  My testimony is that he promised me he
10   would put those moneys into investments that
11   qualified for tax credits.  So within those
12   confines, he had free reign to put them in what
13   entities met those qualifications.
14   Q.  And I know I showed you earlier that
15   FCI investor letter from 2015, and you had said
16   that you never received that letter, correct?
17   A.  Correct.
18   Q.  Are you familiar with the Legacy
19   Investor Project Ownership Conversion -- I guess
20   for lack of a better word -- procedure that FCI
21   was using at the time in order to convert all
22   the debt into the ownership of all the
23   properties that were in the FCI portfolio?
24   A.  No, sir.

Page 104

1    Q.  Did you ever have any conversations
2    with Mike or anyone else at FCI or Frantz
3    Ventures about the inner workings of how that
4    would all work?
5    A.  No, sir.
6    Q.  If I told you that part of that process
7    was that the investment moneys that were
8    invested in or put into an account owned by
9    what's called a sharing or a conversion entity
10   and then the investments at some other point in
11   time that are in that conversion entity can then
12   be converted into other types of investments
13   pretty easily and that was how Mike was going to
14   allocate different historical tax credits to
15   different investors?  Did he ever have any
16   conversation with you about that?
17   A.  No, sir.
18   Q.  If what I just told you is true and
19   that was the procedure that he was using with
20   the money that was invested with him and Frantz
21   Ventures and/or FCI and the way it all worked
22   out was that money that you may have given him
23   or another investor may have given him might not
24   have initially been invested into a project with

Page 105

1    historical tax credits involved but later in
2    time would eventually be put into this sharing
3    conversion entity that allowed FCI or Frantz
4    Ventures or Mike to convert the investments into
5    different portfolios and different investments
6    at that point in time so that historical tax
7    credit could actually be allocated to the
8    original investment, would you have had a
9    problem with that as long as the IRS didn't have
10   a problem with that?
11   A.  Well, it would have had to have
12   occurred in the year 2016 because that's when
13   the tax liability would have occurred.  That's
14   what I was promised.
15   Q.  Right.  But I asked -- I'll reask the
16   question.  If what I just described to you ended
17   up that your money -- let me rephrase that
18   question.
19   If your money that you invested
20   with Mike or his entities ended up in this
21   sharing or conversion entity and then at the
22   proper time was converted into an investment
23   that allowed you to take advantage of the
24   historical tax credits with respect to a

JAMES LORES RADERS, 08/18/2021                              Page 106..109

Page 106

1  particular piece of real estate, would you have
2  had any problem with Mike's investment of your
3  money that way?
4      A.  I don't know.  That was never discussed
5  with me, so I would have to take some time to
6  take a look at exactly how that worked.  All I
7  know is I was guaranteed that I would have
8  documentation of investments that met criteria
9  to satisfy the offset of income incurred in
10  2016.  That's all I know.
11      Q.  Right.  I guess my question is, as long
12  as you got that documentation -- I'm not saying
13  you did, but assuming that you did get that
14  documentation and assuming that the IRS didn't
15  have any problem with the documentation that was
16  submitted and historical tax credits that were
17  available were allocated to offset your tax
18  penalties, did you ever tell Mike or anyone else
19  at any of Mike's companies that there were
20  certain ways of investing your money that were
21  not okay with you anyway?  Does that make sense?
22      A.  Well, again --
23      Q.  Let me rephrase the question.
24      A.  I was guaranteed that not only would

Page 107

1  they be invested in projects that met the
2  criteria that would offset the income incurred
3  by liquidation of the IRA, I was also guaranteed
4  a position within the company.  That would be
5  documented as well.  So not only would the money
6  be invested to document the tax offset, it would
7  have to meet the criteria that I had some equity
8  or stake in it.  So I don't know if the scenario
9  you're talking about would do all that, but
10  that's what I was told.
11          So it would have to meet those
12  criteria.  If all those things were met, then I
13  would have an equity stake, but none of that
14  came to be.
15      Q.  Right.  I guess that's the question I'm
16  getting to.  As far as you were concerned, as
17  long as the criteria that you had was met for
18  purposes of your tax liabilities and other
19  things that were promised to you, did you ever
20  tell Mike that you wanted to have a say or
21  direction in exactly how your money was
22  invested, or were you more investing with Mike
23  because you trusted him and you just wanted to
24  get the end result and it wasn't really your

Page 108

1  business or care to know exactly how your money
2  was invested at that time?
3      A.  Well, a couple of things about that.
4  One, he promised me he was going to bring me
5  into the fold of the company so I would have a
6  say in those things.  So that was supposed to
7  happen as well.  And the $30,000 a month
8  payments were supposed to happen because at that
9  point I had no cushion.  Mike had all my money
10  at that point.
11      Q.  All right.  I understand.  I think you
12  also said that if you would have known that Mike
13  was going to use any amount of your investment
14  money in order to pay debts that he or his
15  company may have had to McGladrey, that you
16  would have told Mike that he could not do that;
17  is that correct?
18      A.  Can you read back my testimony?  I'd
19  like to hear exactly.  I think I answered a
20  question that if I knew -- did I know if that
21  was done, would I have approved it?  No.
22      Q.  Would your answer to that question
23  change if the investment of your moneys was paid
24  to McGladrey on debt that was incurred because

Page 109

1  of real estate investment projects that did
2  involve historical tax credits and would
3  eventually end up in one of these convertible
4  entities that would allow you to take advantage
5  of the historical tax credits, would you still
6  then say that you would have told Mike he
7  couldn't pay McGladrey with money that you
8  invested with him?
9      A.  I'm really sorry.  I don't have the
10  sophistication to answer that question.  I would
11  have to take a closer look at the document and
12  if you want to -- if we want to put it on paper
13  and let me look at it, I will.  But I'm not sure
14  what it is that you're asking me.
15      Q.  Well, you testified that you wouldn't
16  have wanted Mike to pay McGladrey with the money
17  that you invested with Mike and my question to
18  you is, do you have an understanding of tax
19  consequences, financial accounting and the
20  procedures that Mike was using to invest your
21  money and other investors' money in these
22  different real estate investment projects to
23  even have an opinion as to whether or not you
24  would have wanted Mike to pay McGladrey with any

Page 110

1  of the moneys that you invested if, you know, at
2  the end of the day, you were getting credit, you
3  were getting historical tax credits, your tax
4  liabilities were being paid off and you were
5  getting the rate of return you were promised?
6      A.  There are several if's in there, and if
7  all of those things are true, you're correct.
8  And you're also correct that I don't have that
9  sophisticated knowledge.
10      MR. LANGS:  Fair.  I think that's all I
11  have.
12      MS. CAMMACK:  I just have kind of a
13  follow-up I guess, one more with that.
14          RECROSS-EXAMINATION
15          by Ms. Cammack:
16      Q.  Counsel just asked you, he said a lot
17  of if's; but none of that was ever communicated
18  to you, correct?
19      A.  No.
20      Q.  So you were never advised of any
21  diagram that's contained in this FCI investor
22  list, correct?
23      A.  That is correct, I never was.
24      Q.  So whether or not the money ultimately

Page 111

1  gets to the historical tax credit property, like
2  that whole discussion was never brought to you
3  for understanding or approval, correct?
4      A.  That is correct.
5      MS. CAMMACK:  That's all I have.  We
6  will read.
7      MS. REPORTER:  Okay.
8      MS. CAMMACK:  So we'll read your
9  deposition, and not waive it.  And we will
10  order.
11      MR. LANGS:  I don't need a copy of the
12  transcript at this point in time.  We'll contact
13  you if we do.
14          WITNESS FURTHER SAITH NOT
15              (1:55 p.m.)
16
17
18
19
20
21
22
23
24

Page 112

1  UNITED STATES OF AMERICA    )
   MIDDLE DISTRICT OF FLORIDA  )
2  ORLANDO DIVISION            )  SS.
   STATE OF FLORIDA            )
3  COUNTY OF ORANGE            )
4      I, SUSAN M. REED, Certified Shorthand
5  Reporter for the State of Illinois, do hereby
6  certify that JAMES LORES RADERS was first
7  remotely duly sworn by me to testify the whole
8  truth and that the above remote videoconference
9  deposition was reported stenographically by me
10  and reduced to typewriting under my personal
11  direction.
12      I further certify that the said remote
13  videoconference deposition was taken at the time
14  and place specified and that the taking of said
15  remote videoconference deposition commenced on
16  the 18th day of August, A.D., 2021, at 12:00
17  P.M., EST.
18
19
20
21
22
23
24

Page 113

1      I further certify that I am not a
2  relative or employee or attorney or counsel of
3  any of the parties, nor a relative or employee
4  of such attorney or counsel or financially
5  interested directly or indirectly in this
6  action.
7      In witness whereof I have hereunto set
8  my hand at Chicago, Illinois, this 7th day of
9  September, A.D., 2021.
10
11
12
13
14
          SUSAN M. REED, CSR
15          License No. 084-003114
16
17
18
19
20
21
22
23
24

```
                                                Page 114
 1   UNITED STATES OF AMERICA    )
     MIDDLE DISTRICT OF FLORIDA   )
 2   ORLANDO DIVISION             )  SS.
     STATE OF FLORIDA             )
 3   COUNTY OF ORANGE             )
 4
             I, JAMES LORES RADERS, hereby certify
 5   that I have read the foregoing transcript of my
     remote videoconference deposition taken on the
 6   18th day of August, A.D. 2021, consisting of
     pages 1 through 113, inclusive, and that to the
 7   best of my knowledge it is a true and correct
     transcript of said remote videoconference
 8   deposition, except as I have changed it on the
     attached sheets in accordance with the rules
 9   provided by the said Court.
10
                    _____
11                        JAMES LORES RADERS
12   SUBSCRIBED AND SWORN TO
     before me this _____ day
13   of _____, A.D., _____.
14
     _____
15        Notary Public
16
17
18
19
20
21
22
23
24
```

```
                                                Page 115
 1   Errata Sheet
 2
 3   NAME OF CASE: JAMES L. RADERS vs MICHAEL D. FRANTZ
 4   DATE OF DEPOSITION: 08/18/2021
 5   NAME OF WITNESS: James Lores Raders
 6   Reason Codes:
 7        1. To clarify the record.
 8        2. To conform to the facts.
 9        3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25                    _____
```